## ASAHEL HARWOOD *v*. BENTON & JONES.

### *Water Course.　Servitudes.　Deed.*

S. originally owned a mill, and an artificial, but ancient, mill-pond, with the surrounding land. He subsequently granted a parcel of such surrounding land, not however bounded on the pond, to the plaintiff's grantor by warrantee deed, with no expressed reservation therein of any right to flow the same, and afterwards conveyed his mill and water privilege to the defendants' grantors. *Held*, that by his deed to the plaintiff's grantor, S. did not part with the right to flow such land, as he had formerly done; and that the subsequent exercise of such right by himself, and his grantees of the mill, was not a breach of his covenant against incumbrances; and independently of the plaintiff's rights derived from adverse use, was not the ground of an action in his favor.

If one, by raising the height of water upon his own land, cause subterranean streams to set back and stand upon the land of another, the latter has no ground of action therefor.

CASE for obstructing a stream, and thereby causing water to flow upon the garden and into the cellar of the plaintiff. Plea, not guilty, and trial by jury at the December Term, 1857,— ALDIS, J., presiding.

Samuel Safford was originally the owner of the defendants' water privilege, of the lands covered by and surrounding their mill-pond, and of the plaintiff's land described in his declaration. On the east side of the pond was a narrow strip of low land ; next east of this strip was a road running nearly parallel with the pond, and on the east side of the road was the plaintiff's land, no part of which was bounded upon the pond.

The title of the plaintiff to his garden was derived, through several *mesne* conveyances, by deed from Safford to one Park, dated August 11, 1817, and to his house lot by deed from Safford to the plaintiff, dated May 3, 1827. These deeds merely described the land in question by metes and bounds, professed to convey them "with the appurtenances" to the grantees, their heirs and assignees, and contained the usual covenant against incumbrances. The pond was caused by a dam and not by the natural flow and course of the stream. A dam, with a grist mill operated by the water raised thereby, had stood upon this mill privilege longer than the recollection of any person living at the time of trial, and the dam then in existence was built by Safford

in 1814, repaired by Abel & Savage in 1828, and was pur-
chased with the water privilege by the defendants in 1853, in
which year it was again repaired by them.

The plaintiff offered testimony tending to show that the dam
was raised in the middle of the stream by the defendants in 1853
about two feet higher than it formerly had been, and about a foot
higher at the ends of the dam—that his garden and house lot and
cellar, prior to such repairs upon the dam, had never been flowed
except upon a very few occasions when there had been extraor-
dinary freshets; and that since such repairs, his garden had
been flowed through the spring and till the middle of June, so
that a large part of it was incapable of cultivation, and that the
water had stood in his cellar for several months in the year, dur-
ing high water.

The defendants offered testimony tending to show that between
1822 and 1828, the water in freshets, and occasionally in high
water, had been flowed by means of the dam, back and over the
land now the garden of the plaintiff; that the water in the pond had
been as high, and had flowed as far back at and since the repairs
of Abel & Savage in 1828, as since the dam was repaired by
the defendants in 1853 ; that in 1853 they did not raise the dam
any higher than it was raised by Abel & Savage in 1828 ; that
the dam of Abel & Savage in '1828 was repaired so as to be
originally nearly level, and so that the water flowed over its
entire length, but that the center of the dam had gradually sunk
in the middle, and the dam had become leaky so that the water
in the pond did not for some years previous to 1853 rise so high
as formerly ; that the ends of the old original dam of 1814 were
of the same height as the dam of Abel & Savage, and the dam
of the defendants in 1853, and that the injury of which the plain-
tiff complained, was caused by water from underground streams
coming not from the pond, but from an opposite direction, and
flowing into the pond.

The defendants requested the court to charge the jury that
Abel & Savage under their deed from Safford had a right to
repair the dam and raise the center to the same height of the
ends of the dam, provided the old dam was built originally level
upon the top, and that although since that time the dam had con-

tinued to settle in the center, and become so out of repair that, ordinarily, the water in the pond had not flowed back upon the plaintiff's land as much for fifteen years before the repairs in 1853 as when the dam was originally built, yet the defendants' right to raise the water to the same height as it was raised by the original dam when level, was not lost, and that the defendants were not liable unless they had raised the dam above its original level height; also, that if the water was higher in consequence simply of leveling and making the dam more tight, although the plaintiff might have been injured thereby, he could not recover provided the water was no higher than it had been accustomed to be raised before and at the dates of the deeds from Safford to Park, and to the plaintiff.

The defendants also requested the court to charge the jury, that if the water in the cellar and upon the garden of the plaintiff came up from subterranean streams, although the water in the pond so obstructed their progress as to cause the water to rise up, the defendants were not liable.

The court declined to charge as requested, but did charge the jury—that as Safford in 1817 and in 1827 owned the lands adjoining the pond, including the lands of the plaintiff, and then conveyed by deed, with a covenant against incumbrances, describing the land by metes and bounds, and not bounding it by the margin of the pond, and without reserving any right to flow the land so conveyed, he then by operation of his deeds parted with all his right to flow the lands so conveyed, and therefore that the right of the defendants to flow the lands so conveyed, if any existed, must have been acquired by an adverse use of the land by flowing it for fifteen years since the dates of the deeds respectively, viz: as to the garden by fifteen years adverse use since August 11th, 1817, and as to the house-lot by fifteen years use since May 3d, 1827; and that if the defendants, and those under whom they claim had not for these periods respectively, raised the water in the pond to as great a height and caused it to flow back to as great an extent upon the garden and the house-lot respectively, as it had since the defendants repaired the dam in 1853, then the defendants were liable.

The court further charged the jury that if the injury of which

the plaintiff complained was caused by the water from underground streams gushing out upon, or percolating through the plaintiff's land, without being obstructed by the water of the pond having been raised higher than the defendants had a right to raise it, then the plaintiff could not recover; but that if the defendants had raised their pond since 1853 higher than they had the right to do by previous uses, and thereby had obstructed the water in subterranean streams from passing off as formerly, and had caused it to gush out upon, or percolate through, and stand upon the plaintiff's land and in his cellar to his injury, then the defendants were liable.

To the refusal of the court to charge as requested, and to the charge as given, in the particulars above detailed, the defendants excepted.

*Daniel Roberts* and *Harmon Canfield*, for the defendants.

I. Safford, being the owner of the whole heritage, could, by virtue of his general right of property, impose upon or attach any quality to its several parts that he pleased; Gale & Whately on Easements, 39.

II. The quality so attached to that portion conveyed by him to Park and the plaintiff is appurtenant to the part retained, and is *impliedly reserved* in his conveyances as part of his own estate in the *dominant tenement*, and not extinguished by a severance of the heritage. So the deeds should be construed; Gale & Whately on Easements, 42, 44, 61, 254, 255, 428; *Cary v. Daniels*, 8 Met. 466.

1. Because without that quality the beneficial enjoyment of the part retained would be in a measure, if not wholly, lost. Hence it was necessary; Angell & Ames on Watercourses, 204.

2. It was palpable and manifest to the vendees at the time of the conveyances.

3. It was an "ancient" burthen, "the memory of man runneth not to the contrary," and from its character, apparently *continuous*. Hence it was really the same to the vendees as though the stream had so flowed *ex jure naturæ*.

III. If the injury to the plaintiff was caused by the water of underground streams, although obstructed by the plaintiff's raising water in the pond, the plaintiff cannot recover.

Harwood *v.* Benton & Jones.

There is no allegation in the declaration that the injury was so caused; and even if there were, it would be *damnum absque injuria*, and no right to recover would exist; *Chatfield* v. *Wilson*, 28 Vt. 649.

*Hall & Hall* and *A. P. Lyman*, for the plaintiff.

1. Did Safford, at the time of his deeds to Park and the plaintiff, retain the right to flow the lands conveyed?

This right to flow the lands of another is an easement, and it is also an incumbrance; Bouvier Law Dic. Tit. Easement and Incumbrance; *Butler* v. *Gale*, 27 Vt. 739.

If this precise right to flow existed in a third person, would not a quitclaim deed of the land convey it?

If Safford could retain this right to flow, he could with equal reason retain the right to the flume and dam, had they stood upon the premises, the water being taken to the mill by a trunk or trough.

It is the common understanding that an ordinary deed passes all the interest of the grantor in the lands conveyed, unburthened by any right of his; *Johnson* v. *Jordan*, 2 Met. 234.

The covenant against incumbrances estops Safford from claiming any incumbrance on the land conveyed.

2. The case shows that this flowage, of which we complain, was not an *apparent* and *continuous* flowage. Ordinarily the water does not flow upon the surface on the land conveyed to Park and the plaintiff, and therefore does not come within the rule claimed by the plaintiff.

3. The court was correct in its charge relative to the effect of the dam upon underground streams.

The defendants below relied upon *Chatfield* v. *Wilson*, 28 Vt. 49, which case determines a novel question upon the law of water courses.

We are unable to perceive its application here. That case decides that each land owner may dig as he pleases on his own land, though by so doing he drains his neighbor's spring by subterranean streams or by filtration or percolation.

Whether a man may, by raising an artificial pond of water, so obstruct the natural flow of these streams as to cause them to

Harwood *v.* Benton & Jones.

gush out upon his neighbor's land, is another question.    Whether by thus raising water, although confining its surface to his own land, he may cause it to percolate or filtrate the adjoining soil, and soak his neighbor out of house and home, is another and indeed a *novel* question ;    *Cooper* v. *Barber*, 3 Taunt. 99.

BARRETT, J.    This is an action on the case to recover dama- ges occasioned by the setting back and flow of the water upon the plaintiff's premises, on account of the wrongful obstruction thereof by the mill dam of the defendants.,

The case discloses that Samuel Safford originally owned a water privilege, on which were a dam, mill pond and mills in operation from time immemorial, and also owned the lands surrounding and bordering upon said pond, of which lands the garden and house lot of the plaintiff were, for a long time, parcel ; that a public highway has for a long period existed along upon the eastern side of said pond, a little distance from it ; that the plaintiff's premises lie upon and east of said road, and in no part bounded by said pond ; that the plaintiff, through several *mesne* conveyances, derived title to his garden by and from said Safford, dated August 11, 1817, and to his house lot by deed direct from said Safford to himself, dated May 3d, 1827.    The dam in question (replacing a former one) was built in 1814, and was repaired in 1828, and the mills and privilege were purchased by the defendants in 1853, who in the same year repaired said dam.    The plaintiff's evidence seems to have been directed to the point that, by said repairs, the dam was raised above its former elevation, and that thereby the alleged damage to the plaintiff had been caused.    This seems to have been the principal subject of controversy upon the evidence.    The county court, in the charge to the jury, assumed, upon the construction and effect of said deeds of Safford, that, as to the plaintiff, Safford by said deeds parted with his right to affect the land conveyed by them, by keeping up any dam at all, and if such right thereafter existed, it was in virtue of a *user* of more than fifteen years.    Under such a construction of said deeds, it became unimportant how high the dam had been at any time prior to the commencement of such *user*, or how high it was, and how the premises now owned by the plain-

tiff were affected by it up to and at the time Safford executed his deeds of said garden and house lot.

The defendants claim rights in reference to the condition and height of the dam, and the consequent flow of the water, that might be seriously prejudiced and restricted by such a construction and operation as were given to said deeds by the county court.

Our first business is to consider the exception taken upon this branch of the charge.

While Safford owned the mill privilege and the surrounding lands, including, as parcel thereof, what the plaintiff now owns, it was his right to do with said property whatever he pleased. In the exercise of that right he created and continued for a long period the mill pond, by means of a dam of such height as served his purposes in operating a mill in the usual course of that kind of business. "When the land burdened and the land benefitted belong to the same owner, he may change the qualities of its several parts at his will, and his express volition evidenced by his acts must be as effectual to impress a new quality upon his inheritance as the implied consent arising from his long continued acquiescence ;" Gale & Wh. on Easements, 39.

While Safford was thus the owner, of course the idea of an *easement* could not attach to such a treatment and use of the stream of water, relatively to the adjacent land. That land, with the stream and the use of it as a mill privilege, constituted an entire estate. Such dam and the use of it were parcel of such estate, and not an *easement,* or in the nature of an easement, nor an incumbrance, or of the nature of an incumbrance. The use of the mill privilege, in the manner shown by the evidence, and the effect of it, impressed a condition upon the adjacent soil that might affect its suitableness and value for various purposes, might render it less suitable for agricultural or building purposes than it would have been if the stream had not been obstructed by the dam.

Such being the condition of the estate of Safford, produced by the dam existing at a certain height, and causing its natural effect upon the water of the stream at its various grades of height, in causing it to set and flow back upon the adjacent land, Safford

conveyed that part of the land which the plaintiff now owns, covenanting against incumbrances in common form, and making no express reservation in reference to the mill privilege. What did he part with by such conveyance ? the land as described in its condition as produced and affected by the existing dam, or the land and also all right to affect it by interrupting or impeding the natural flow of the stream by the continuance of the dam ?

The deeds, in terms, purport to convey only certain parcels of land specifically described, in no part abutting upon the stream. If they are to be held to have divested Safford of his right to affect said land by the continuance of his dam, such result is not directly produced by the primary force of the terms of the granting part of the deeds. It would seem to be the consequential result of the covenant against incumbrances. Such covenant has relation to rights existing in, or in relation to, the property conveyed, appertaining to parties other than the grantor, and which may be claimed and exercised, and enforced upon and against said property, as against such grantor and his assigns.

Now it it obvious, that, in this sense, no such incumbrance existed upon the property now owned by the plaintiff, while the title to it was in Safford. Of course, then, at the moment of passing the title and making the covenant by the delivery of the deeds, the property was free from incumbrance, and so there could not have been a breach at that time, in virtue of the state of the title to, or of rights then existing in, or in respect to, said property. Is it matter of legal intendment that the grantor should, by force of such covenant, be estopped from exercising any right which, if it had existed in, and been exercised by, a third person, prior to said conveyance by Safford, would have constituted an incumbrance? So to hold would seem to be giving to such a covenant a scope and effect beyond what has been regarded as its ordinary and legal limits, and no precedent or authority has been cited to justify us in so holding.

It would have presented a novel case if the defendant, immediately after the conveyance to him by Safford, had brought an action against him for the breach of his covenant against incumbrances, and sought to maintain it on the ground of the existence

of said dam and pond under a claim of right by Safford to have and continue such dam and pond, as they were, up to and at the moment of delivering his deed. And if Safford had continued his dam and pond for any time after such conveyance under such claim of right, he would have been estopped to deny the existence of the right when averred against him as constituting an incumbrance. The only question in such action would have been, whether it was an incumbrance or not, within the scope and operation of the covenant.

In view of the infrequency of modern cases in which the subject of this branch of the charge is involved, it seems proper to consider somewhat more in detail, and in reference to both principle and authority, the true character, construction and effect of Safford's deeds, as bearing on the view taken by the county court.

In Gale & Whateley on Easements, p. 40, it is said, "it is true that, strictly speaking, a man cannot subject one part of his property to another by an easement, for no man can have an easement in his own property; but he obtains the same object by the exercise of another right, the general right of property; but he has not the less permanently altered the quality of the two parts of his heritage; and if, after the annexation of peculiar qualities, he alien one part of his heritage, it seems but reasonable, if the alterations thus made are palpable and manifest, that a purchaser should take the land burthened or benefitted, as the case may be, by the qualities which the previous owner had undoubtedly the right to attach to it.   *    *    *    *

There is no reason why a purchaser should not exercise the same degree of caution in ascertaining what easements his projected purchase is liable to in favor of his vendor as well as in favor of other adjoining owners."

The learned authors show, from a most thorough examination and analysis of the cases, that this view has been recognized and acted upon by the courts from a very early period in the record of judicial decisions in England, and also show that the law of the *Civil Code of France* accords therewith. They also show that in this class of cases, while the law will make all necessary implications to prevent the grantor from derogating from his own

grant, it will reciprocally and equally make like implications to prevent the grantor from being shorn of his just rights in reference to the property which he retains.

The law of the *Civil Code* is, "if the proprietor of two heritages, between which there exists an apparent sign of servitude, disposes of one of the heritages without any stipulation being contained in the contract respecting the servitude, it continues to exist, actively or passively, in favor of the heritage alienated or upon it," which is tantamount to saying that such servitude continues to exist in favor of the heritage not alienated upon that which is alienated, as well as the reverse. And this is equally so where the grantor of a portion of an entire estate has made that portion subject to the convenience of another, by some express act done during the union of the different portions of such estate.

It is laid down as an unquestioned proposition, that, "upon the severance of a heritage, a grant will be implied of all those continuous and apparent easements which have in fact been used by the owner during the unity, though they have had no legal existence as easements;" and the doctrine is equally well established that the law will imply a reservation of like easements in favor of the part of the heritage retained by such grantor. On this subject see Gale & Whateley on Easements, ch. 5, and cases cited.

The application of these doctrines to the present case is obvious upon recurring, by way of recapitulation, to the leading facts, viz : that Safford had long owned and kept up the dam and mill, during which time he was also the owner of the lands surrounding and bordering upon said mill pond and mill, including the parcel which the plaintiff now owns and occupies as a house lot and garden. He had thus subjected those bordering and adjacent lands to the use and convenience of the mill privilege and mills; and being thus subjected, he conveyed the parcel of them now owned by the plaintiff. This condition of the estate was obvious, and had been continuous, and was of a character showing that it was designed to continue thereafter, as it has in fact done. This, then, was a palpable and impressed condition, made upon the property by the voluntary act of the owner; and we

think that, without any stipulation in the deed upon the subject, the true view of the law is, that the grantee took the land which he purchased in that impressed condition, with a continuance of the servitude of that parcel to the convenience and beneficial use of the mill.

As we understand the case of *Carey* v. *Daniels*, 8 Met. 466, in an elaborate opinion delivered by SHAW, Ch. J., the law of the subject was held to be as we have now set it forth, and we regard the case itself to be a direct authority for our present application of the law. Without stating in detail the various conveyances by which the parties to that case derived their respective titles, it will be sufficient, for the purpose of showing the principle and its application, to say that the plaintiff's grantor owned a mill with its privileges and appurtenances, and while so owning it he built another dam a little below, and erected a mill upon it, and for a period continued to use both mills. In times of high water the lower dam caused the water to set back upon the wheels of the upper mill and impede their operation, in which event it was the custom for the hands of the upper mill to open a waste gate in the lower dam or mill and let off the excess of water. In this situation of the property the upper mill property was sold and conveyed with all privileges and appurtenances, and with covenants against incumbrances created by the grantor, but without any reservation as to the lower dam and mill, which the plaintiff's grantor retained, but subsequently sold and conveyed to the defendant. In high water the plaintiff experienced the inconvenience of the back water caused by the lower dam, and claimed that by virtue of the conveyance to him, he was entitled to hold his mill free from the injurious effects of the lower dam, and, at any rate, that he had the right to open the waste gate of the lower dam, as had been the custom when the entire property was owned by the same proprietor, both of which claims were denied, and therefore said suit was instituted. It was held that no implication *from necessity* arose against the defendant's right to continue the lower dam, and that there was nothing to extend the operation of the deed under which the plaintiff held, beyond the plain import of its terms, which was to carry the upper water power, mills and land, as they were then modified and appropriated by

the defendant's dam below; and as to the argument drawn from the covenant of warranty by the grantors, it was held that the right to use the water below the granted premises, as modified by the appropriation previously made for the lower mill, was not, in legal contemplation, an incumbrance, but rather in the nature of parcel of such lower estate; and that the maintaining of the lower dam, to the height to which the water had been appropriated for its use, was not an incumbrance upon the estate granted, and it was still further held that the plaintiff had not the right to open the waste gate of the lower dam to prevent back water.

In accordance with the views thus expressed, we are led to regard the charge to have been erroneous as to the construction and effect of the deeds of Safford through which the plaintiff acquired his title. We think they should be held to have conveyed the parcels which the plaintiff now owns in the condition in which they were at the time of the respective conveyances by Safford, as affected by the dam at the height it then was, and that the right to maintain and continue said dam at such height was not impaired or affected by those deeds, either by the terms of the granting part or by the covenants against incumbrances.

This result upon the first ground of exception, leads us to the disposition of the other exception taken to the charge.

If the alleged injury to the plaintiff's premises was produced by keeping the dam at the height it was, at the time of the conveyances by Safford, it can make no difference whether the water was caused to set back over the surface, or prevented the underground streams and currents from percolating through the soil off from the plaintiff's premises. In either case there would be no right of recovery. But the court charged the jury "that if the defendants had raised their pond since 1853, higher than they had a right to do by the previous uses, and thereby had obstructed the water in subterranean streams from passing off as formerly, and had caused it to gush out upon, or percolate through and stand upon the plaintiff's land and in his cellar to his injury, then the defendants were liable."

This charge, in connection with the request of the defendants, involves a consideration of the distinction to be taken between

water flowing upon the surface and that which percolates in sub-
terranean streams and veins.

So far as flowing surface water was concerned, the plaintiff
could not call in question the right of the defendants to keep their
dam of any height they chose, provided it did not cause the water
to flow upon or soak into his land. He was not bounded upon
the stream, and so was not a *riparian* owner. He could not
question the defendants' right to overflow the whole surface up
to his line, and in this respect it could be no element in his case
whether the defendants' pond had been raised higher since 1853
than it had been by previous user. It could do him no injury,
unless it should cause the water to come upon or soak into his
land.

The question then arises whether, in case the defendants, within
and since the year 1853, have kept their dam higher than it was
at the time of the conveyances by Safford, and thereby, by caus-
ing a greater height of water in their pond, has impeded the flow
of the underground currents through and off from the plaintiff's
premises, for this cause alone they are liable to the plaintiff for
any injury he may have sustained thereby. This question excludes
the idea that, as against the plaintiff, the defendants have tran-
scended their right in respect to the surface water, or infringed
any right of the plaintiff in regard to it. For the purposes of
this question, the case stands much the same as if the defendants,
upon the western margin of the road adjacent to the plaintiff's
premises, but upon their own land, had sunk and constructed an
impervious wall, and thereby, in the language of the charge,
"obstructed the water in subterranean streams from passing off
as formerly, and had caused it to gush out upon, and percolate
through, and stand upon, the plaintiff's land and in his cellar, to
his injury." Can it make any difference how this effect upon
the underground streams is produced, whether by a bank of stones
upon the defendants' land or a bank of water? Have not the
defendants as good a right to pile up the one as the other? It
would seem difficult to assign a reason why not.

(In *Chatfield* v. *Wilson*, 28 Vt. 49, it was held that the law of
running surface streams is not applicable to percolating under-

Harwood *v.* Benton & Jones.

ground streams, and that, as to percolating water, there are no correlative rights between adjoining owners of the soil touching its use, and it was decided the defendant was not liable for cutting off a supply to the plaintiff's tub by digging on his own territory, even though he did it wantonly, and for the purpose of injuring the plaintiff. The only criticism that we have heard upon that decision was in respect to excluding the wanton and improper motive as an element in the ground of the defendant's liability. In the present case there is no imputation of such a motive. Treating that case as a sound exposition and application of the law, must it not be decisive of the question now in hand? It will be noted that in the present case the complaint is not that the water from the pond percolated or soaked into the land and cellar of the plaintiff, but that it obstructed the flow of underground streams from the plaintiff's land, and it was to this specific fact and feature of the case that this part of the charge was directed.

No reason occurs to us why a party should be liable for the result of acts upon his own land which impede the flowing of underground currents from the land of an adjoining owner, thus producing injury, when it is conceded that he would not be liable for acts that would produce injury by preventing the flow of such currents into the the territory of such adjoining owner: why it is less unlawful for my neighbor to drain my well by digging one near mine, on his own soil, than to flood my cellar by the obstruction of a wall or other impediment that prevents the flow of water underground from my premises.

Our late very learned and able associate, Judge BENNETT, in the course of the elaborate opinion in *Chatfield* v. *Wilson*, says, " the laws of the existence of water underground and of its progress while there, are not uniform, and cannot be known with any degree of certainty, nor can its progress be regulated. It sometimes rises to a great height, and sometimes moves in collateral directions, by some secret influences beyond our comprehension. The secret, changeable and uncontrollable character of underground water, in its operations, is so diverse and uncertain that we cannot well subject it to the regulations of law, nor build upon it a system of rules, as is done in the case of surface

48

streams.   *   *   *   We think the practical uncertainties which must ever attend subterranean waters is reason enough why it should not be attempted to subject them to certain and fixed rules of law, etc."

The case of *Greenleaf* v. *Francis* is cited by Judge BENNETT, which (as he says) held that " no action would lie against a man who dug a well on his own land, although he thereby took the water from his neighbor's well, in the absence of all right acquired by grant or adverse user." The case is really put on the ground that "every one has the liberty of doing on his own ground whatever he pleases, even though he occasion some damage to his neighbor."

Being unable to see why the principle and the reasoning in the decision of *Chatfield* v. *Wilson* are not applicable to the part of the charge we are considering, we are forced to regard that part of the charge as erroneous.

These being the only points that were discussed in the argument by the defendants' counsel, we refrain from any consideration of other points that might have been raised upon the requests of the defendants, and the refusal of the court to charge as requested.

The judgment is reversed, and the cause remanded to the county court.