CHARLES J. READ, ADMINISTRATOR *v.* C. A. & A. G. WEBSTER.

November Term, 1920.

Present: WATSON, C. J., POWERS, TAYLOR, MILES, and SLACK, JJ.

Opinion filed May 14, 1921.

*Conveyance Imports Grant of Thing As It Exists Unless Contrary Intention Manifested—Implied Easements—Strict Necessity Required—Implied Easement to Flood Land Conveyed—Mitigation of Compensatory Damages—Cross-examination—Hearsay Evidence—Damages for Flooding Land—Recovery for Injuries not Apparent at Time of Bringing Suit.*

1. The conveyance of a thing imports a grant of it as it actually exists at the time the conveyance is made, unless the contrary intention is manifested in the grant.

2. The nature of a conveyance by a deed containing full covenants of warranty, and without any express reservation, is such that there can be no easement reserved by implication, unless the claimed easement is one of strict necessity to the use and enjoyment of adjoining land retained by the grantor.

3. The parties to a conveyance are presumed to contract in reference to the condition of the property at the time of the grant, so that the existence of an easement by implication depends upon the circumstances as they existed at that time.

4. The essential elements of an easement reserved by implication are: (1) Unity and subsequent separation of title; (2) obvious benefit to the dominant and burden to the servient portion of the premises existing at the time of the conveyance; (3) use of the premises by the common owner in their altered condition long enough before the conveyance to show that the change was intended to be permanent; (4) a strict necessity for the easement.

5. R. owned and operated an ancient mill privilege, the dam to which set the waters of a creek back onto the meadows of a farm also owned by him. Subsequently he conveyed the farm by a deed containing full covenants of warranty, and without any express reservation of the right to flow the meadows,

without which right the mill privilege was valueless. *Held*, that there was an implied reservation of the then existing right of flowage in the granted premises.

6. In an action brought by the owner of the farm against R.'s grantees of the mill privilege for the flooding of his land by the dam, the defendants were entitled to go to the jury on their claim of right to maintain the dam at its present height (which their evidence tended to show was its height at the time R. conveyed the farm), because of an implied reservation, and were not confined, as the court charged, to such rights as had subsequently been acquired by prescription.

7. In general, compensatory damages cannot be mitigated.

8. The defendants could not reduce the damages recoverable by the plaintiff for the unlawful flooding of his land by showing that he made large profits by cutting ice from the mill pond on his land, which he could not have done had the dam been kept at a lower level.

9. Cross-examination of one of plaintiff's witnesses, who had testified only to the presence of a certain iron pin and to the height of the dam with reference thereto, as to whether he ever learned that the pin was connected with the height of the dam, etc., was properly excluded, as calling for hearsay evidence.

10. Plaintiff's damages, if entitled to recover, would include injury to a farm road occasioned by defendants' unlawful acts committed before the commencement of the suit, and all effects of the flowage before suit was brought, both to the land for tillage purposes and to the road, although they may not have been apparent at that time.

ACTION OF TORT for the unlawful flooding of plaintiff's land by means of a dam maintained by the defendants. Answer, general denial and prescriptive right. Trial by jury at the March Term, 1920, Franklin County, *Moulton*, J., presiding. Verdict and judgment for the plaintiff. The defendants excepted. The opinion states the case.

*Elmer Johnson* and *E. A. Ayers* for the defendants.

*W. H. Fairchild, F. L. Webster*, and *D. W. Steele* for the plaintiff.

TAYLOR, J. The plaintiff, as administrator of Ephraim S. Read's estate, brings this action in tort for the unlawful flooding of land owned by his intestate in his lifetime by means of a dam maintained by the defendants on Black Creek, in the town of Fairfield. The trial was by jury, with verdict and judgment for the plaintiff. The defendants own a sawmill and mill privilege, and the dam in question furnishes the power for their mill. They acquired title to the mill and privilege January 2, 1902, from the estate of R. S. Read. It did not appear when the mill was first built, but a dam of some character had been maintained and the mill operated for a period of time beyond the memory of old men. From the time R. S. Read acquired the property in 1864, until his death in 1900, he operated the mill every year, and maintained a dam across the creek continuously. The operations were continued by the defendants from the time of their purchase in 1902 to the time of the trial.

The land which the plaintiff claims to have been damaged by the flooding is part of a farm which lies on either side of Black Creek, and about forty rods above the defendants' mill property. This farm was formerly owned by R. S. Read and was conveyed by him to Ephraim Read, a brother, in March, 1866, by a deed of warranty in common form with the usual covenants. The deed contained no express reservation of flowage rights in the land conveyed. Prior to the time of this conveyance, and since 1864, R. S. Read owned both the farm and the sawmill and mill privilege. The distance from the dam to the upper boundary of the plaintiff's land following the creek is about three-fourths of a mile, and the natural fall of the water along that portion of the creek is slight. In the year 1915 or 1916, the defendants made repairs on their dam, leaving the top about on a level with a certain iron pin in the ledge at one end of the dam. The plaintiff claimed, and his evidence tended to show, that in making such repairs the dam was raised approximately twelve inches above the height at which it had previously been maintained by the defendants and their grantor for more than thirty years; and that the raising of the dam set the water of the creek back upon his meadow land, causing the damage complained of.

It will be well to notice at this point the respective claims of the parties. The defendants claimed that they had a right to maintain the dam to the height of the iron pin, and to flood plaintiff's meadows to the extent a dam of that height would

16

flood them, and their evidence tended to show that the dam had been so maintained for many years. The plaintiff admitted in his complaint the right of the defendants to obstruct the stream by a dam as an appurtenance to their mill privilege, if rightfully maintained; but based his right of recovery upon the claim that the raising of the dam at the time it was repaired was without right. He claimed that the deed of the farm to his intestate left no right in R. S. Read to flow the meadows, but, as matter of law, released the farm from any flowage rights that may have then existed in favor of the mill privilege; and that a prescriptive right to maintain the dam at the height at which it has been maintained since it was repaired had not been acquired by the defendants or their grantor. The plaintiff made no claim that the defendants or their grantor had lost any right they may have had to flood the meadows by a dam at the height of the iron pin by reason of any adverse use by the plaintiff or his intestate of the flooded areas for a period of fifteen years. The defendants' evidence tended to show that it would be necessary to lower the dam six or seven feet from its present height to reach a point where it would not interfere with the natural flow of the stream through plaintiff's land. The plaintiff did not claim that the defendants' right to maintain the dam was so limited that it should not interfere with the natural flow of water through his farm, nor that the dam, as maintained prior to the time the repairs were made, was against his right, or resulted injuriously to his land.

It will be seen that the claims and evidence of the parties presented the questions whether the damage complained of was due to any increase in the height of the dam at the time it was repaired; and, if so, whether the defendants had a right to maintain the dam at its present height, the plaintiff claiming that only a right by prescription could possibly have been acquired, and the defendants insisting both upon a prescription right and upon an easement reserved by implication.

The defendants requested the court to charge on the subject of an implied reservation. The requests, which, for present purposes, we deem it unnecessary to detail, were severally denied, and the court instructed the jury that the right to maintain the dam at the height of the pin and the incidental right to flow plaintiff's land could not be claimed by the defendants "by virtue of any deed or grant to them, but they are claimed by them by

what is called prescription." In excepting to the refusal of the court to charge as requested, and to the charge as given on that subject, defendants insisted in substance that there was evidence in the case fairly tending to show that at the time R. S. Read executed the deed to his brother in 1866, he was in the enjoyment, as an appurtenance to the mill privilege, of the right to flow the meadows to the extent that they are now flooded by maintaining the dam to the height of the iron pin; that the mill privilege prior to and at the time of the conveyance of the farm would have been practically valueless without this flowage; and that, in these circumstances, the right to flow the meadows being so essential to the mill privilege, the law will presume the reservation of the privilege by implication on the ground of necessity. This raised the question argued here whether there was evidence tending to show a state of facts from which the law will imply a reservation in the deed to Ephraim Read of a right of flowage in the granted premises. A fair test would be whether on the evidence Ephraim Read could have maintained this action at any time before his grantor had acquired a prescription right of flowage.

[1-5] The circumstances under which a reservation will be implied of a right in premises granted by a deed with full covenants of warranty against incumbrance, are pointed out in *Harwood* v. *Benton,* 32 Vt. 724; *Wiswell* v. *Minogue,* 57 Vt. 616; *Willey* v. *Thwing,* 68 Vt. 128, 34 Atl. 428; *Dee* v. *King,* 73 Vt. 375, 50 Atl. 1109; *Howley* v. *Chaffee,* 88 Vt. 468, 93 Atl. 120; *Poronto* v. *Sinnott,* 89 Vt. 479, 95 Atl. 647. The principle involved is what is sometimes spoken of as the doctrine of "visible servitudes," or of "*quasi* easements." It arises when the owner of entire premises has permanently altered the quality of the two parts of his heritage, imposing a burden upon one for the benefit of the other. While he retains both portions no question of easement or incumbrance can arise. But when the premises are severed without express grant or reservation of the benefit annexed to one portion at the expense of the other, it becomes important to determine whether the parties intended that the premises granted should be conveyed with the rights or burdens as they existed at the time of the conveyance. The underlying principle is that the conveyance of a thing imports a grant of it as it actually exists at the time the conveyance is made, unless the contrary intention is manifested in the grant. *Feitler* v.

*Dobbins,* 263 Ill. 78, 104 N. E. 1088.   But such is the nature of a conveyance by a deed containing full covenants of warranty, and without any express reservation, that there can be no reservation by implication, unless the easement claimed is one of strict necessity. *Howley* v. *Chaffee, supra.* The meaning of this term is discussed in *Dee* v. *King, supra;* but we do not need to dwell upon that point, for there can be no doubt as to the character of the necessity in the case at bar.   The evidence tended to show that the mill privilege retained by R. S. Read would have been valueless without the right to set the waters of the creek back onto the granted premises.   Manifestly, the easement relied upon was one of strict necessity, for no substitute could be provided for the mill pond which the easement afforded.

However, necessity alone does not create the easement, but is a circumstance resorted to to ascertain the real intention of the parties. Upon the severance of the heritage, a reservation may be implied of those benefits in the land granted which the owner has enjoyed during the unity.   In such case, when the other elements are present, the implication of a reservation arises from the necessity of the easement to the reasonable use and enjoyment of the land reserved (*Willey* v. *Thwing, supra*) ; that is to say, when there could be no other reasonable mode of enjoying the premises retained without the easement.   *Starrett* v. *Baudler,* 181 Ia. 965, 165 N. W. 216, L. R. A. 1918 B, 528; 9 R. C. L. 765. The parties are presumed to contract in reference to the condition of the property at the time of the grant.   *Martin* v. *Murphy,* 221 Ill. 632, 77 N. E. 1126; *Kane* v. *Templin,* 158 Ia. 24, 138 N. W. 901.   The existence of an easement by implication, then, depends upon the circumstances shown by the evidence as they were at that time.   *Lipsky* v. *Heller,* 199 Mass. 310, 85 N. E. 453; *Fitzell* v. *Philadelphia,* 211 Pa. 1, 60 Atl. 323; *Bailey* v. *Hennessey* (Wash.) 191 Pac. 863.   The essential elements of an easement reserved by implication are: (1) Unity and subsequent separation of title; (2) obvious benefit to the dominant and burden to the servient portion of the premises existing at the time of the conveyance; (3) use of the premises by the common owner in their altered condition long enough before the conveyance to show that the charge was intended to be permanent; and (4) such a necessity for the easement as we have indicated above. It is sometimes said that to imply the reservation of an easement it must be apparent, continuous, and necessary, referring, of

course, to the time of the conveyance.   There would seem to be
no doubt that the defendants' evidence tended to establish all the
elements of an implied reservation in R. S. Read's deed to plain-
tiff's intestate of the right to flow the land in question by a dam
maintained at its present height.   The principal controversy in
the evidence was as to the height of the dam as it existed in 1866,
and at different times thereafter; but there was evidence fairly
tending to show that it is no higher now than it was when R. S.
Read conveyed the farm to his brother.   One witness 66 years of
age, who had always lived on a farm bordering on the creek
above the plaintiff's, also flooded by the mill pond, and was
thoroughly acquainted with conditions along the creek, testified
that he had never observed any difference in the height of the
water as compared with what it had been since the dam was re-
paired.   Other witnesses testified that the dam was at the height
of the iron pin at varying times covering a period of forty years.
The sufficiency of the evidence to establish the essential facts
was for the jury.   No claim is made that the defendants or their
grantor have lost any rights in respect of the dam by abandon-
ment or adverse possession; so their present rights depend upon
those retained by R. S. Read at the time of the conveyance of the
farm, coupled with such additional rights, if any, as may since
have been acquired by adverse possession.

The situation is very much like that in *Harwood* v. *Benton,*
*supra,* which is our leading case on the subject of implied reser-
vations.   There one Safford originally owned a mill and an arti-
ficial but ancient mill pond, with the surrounding land.   He
subsequently granted a parcel of the surrounding land, but not
bounded on the pond, to the plaintiff's grantor by a warranty
deed, with no express reservation of any right of flowage, and
afterwards conveyed the mill and water privilege to the defend-
ants' grantor.   The controversy involved the right of the defend-
ants to restore the dam, which had fallen into decay, to its
claimed original height, notwithstanding the consequent damage
to the plaintiff.   The county court charged the jury in effect as
the jury were instructed in the case at bar, and refused a request
to charge similar to the requests that were here denied.   In re-
versing the judgment for errors in the charge, this Court held
that, by his deed to the plaintiff's grantor, Safford did not part
with the right to flow such land as he had formerly done; and
that the subsequent exercise of such right by himself and his

grantees of the mill was not a breach of his covenant against incumbrances, and not the ground of an action by the plaintiff, unless the right had been lost by the plaintiff's adverse use. Judge BARRETT, speaking for the Court, calls attention to the fact that the owner of land may change the qualities of its several parts at will, and benefit one part by burdening another; and that an easement or an incumbrance could not exist while the title was in the common owner. He observes that the land in question, with the stream, and the use of it as a mill privilege, constituted an entire estate; that the use of the mill privilege and the effect of it impressed a condition upon the adjacent soil; and that what was conveyed was the land in its condition as effected by the existing dam. The essential facts of the case and the conclusion reached therefrom are stated thus: ''Safford had long owned and kept up the dam and mill, during which time he was also the owner of the lands surrounding and bordering upon said mill pond and mill, including the parcel which the plaintiff now owns and occupies as a house lot and garden. He had thus subjected those bordering and adjacent lands to the use and convenience of the mill privilege and mills; and, being thus subjected, he conveyed the parcel of them now owned by the plaintiff. This condition of the estate was obvious, and had been continuous and was of a character showing that it was designed to continue thereafter, as it has in fact done. This, then, was a palpable and impressed condition, made upon the property by the voluntary act of the owner; and we think that, without any stipulation in the deed upon the subject, the true view of the law is that the grantee took the land which he purchased in that impressed condition, with a continuance of the servitude of that parcel to the convenience and beneficial use of the mill.''

[6]    It will be seen that all the essential elements of an easement reserved by implication referred to above were present, though express reference is not made to the element of necessity. The case was reviewed in *Howley* v. *Chaffee,* 88 Vt. 468, 477, 93 Atl. 120, where attention is called to the fact that the decision was upon proper grounds as to this element of the reservation. It is at once apparent, without detailing the evidence further, that the defendants were entitled to go to the jury on their claim ·of right to maintain the dam at its present height, because of an implied reservation, and were not confined, as the court charged, to such rights as had subsequently been acquired by prescription.

The plaintiff argues that there is no evidence that it is strictly necessary that the dam should be maintained above the height at which he conceded the defendants are entitled to maintain it; or, in other words, that there is no showing of strict necessity for the single foot of head. But that is not the question. He challenged any right of the defendants to maintain the dam, growing out of an implied reservation. Their reserved right, if any, would be limited to the height of the dam at the time of the conveyance and could neither be enlarged because of subsequent necessity nor cut down by a claim that some part of it was not indispensable; so the important question on this branch of the case is the height of the dam as it was at the time of the conveyance. It is asserted that the defendants elected to rest their defence upon the claim of prescription right; but not so, as the record discloses. Throughout the trial they consistently maintained the position upon which they now rely, although the court adopted the plaintiff's view of the matter, and ruled accordingly. As the exeception to the charge requires a reversal, we do not find it necessary to examine the requests to charge in detail.

[7, 8]   The defendants excepted to the exclusion of certain questions asked the plaintiff in cross-examination, intended to elicit the fact that the plaintiff made large profits by cutting ice from the mill pond on his land, which he could not have done had the dam been kept at a lower level; and excepted to the charge because the jury were not instructed that the plaintiff was entitled to recover only the net damages, after making allowance for the benefit thus derived from flooding his land. In this there was no error. In general, compensatory damages cannot be mitigated. 38 Cyc. 1140. Thus, benefit to the owner of land damaged by a trespass cannot be shown to mitigate actual damages. One cannot thrust benefits upon the landowner by a wrongful act, and then set up the benefits in reduction of the damages caused thereby. *Pinney* v. *Borough of Winstead,* 83 Conn. 411, 76 Atl. 994, 20 Ann. Cas. 923; *Hurley* v. *Jones,* 165 Pa. St. 34, 30 Atl. 499;*Williams* v. *Hathaway,* 21 R. I. 566, 45 Atl. 578; *Leigh* v. *Garysburg Mfg. Co.,* 132 N. C. 167, 43 S. E. 632; *Loomis* v. *Green,* 7 Greenl. (Me.) 386; *Turner* v. *Rising, Sun, etc., Co.,* 71 Ind. 547.

[9]   One of plaintiff's witnesses had testified in direct examination that he worked at the mill at different times during a period of about forty years, had helped repair the dam, and that

it was maintained twelve or fourteen inches below the iron pin. He was asked in cross-examination if he ever learned that the pin was connected with the height of the dam; if he wasn't told the pin determined the height of the dam; and if he ever heard who put the pin into the ledge. The questions were properly excluded, as calling for hearsay evidence. The witness had testified only to the presence of the pin, which was not in dispute, and to the height of the dam with reference thereto. What he had been told as to the relation of the pin to the height of the dam would have no legitimate tendency to test his truthfulness, which was advanced as a justification for the inquiries.

[10] Against the objection that the plaintiff could not recover for damages done since the suit was brought, the plaintiff was permitted to testify under exception, respecting a farm road across the meadows, that "the water is set back there until it is nothing but a quagmire." In view of other testimony respecting the condition of this road, prejudicial error could not be said to appear. But, if entitled to recover, plaintiff's damages would include the injury to the farm road occasioned by the defendants' unlawful acts committed before the commencement of the suit, and all the effects of the flowage before the suit was brought, both to the land for tillage purposes and to the road, though they may not have been apparent at that time. It was the province of the jury to determine this question, and it was submitted to them in a manner not excepted to, leaving the defendants without cause of complaint. See *Goodrich* v. *Dorset Marble Co.*, 60 Vt. 280, 13 Atl. 636.

Other exceptions are argued that present questions not likely to arise on a retrial and so do not require attention.

*Reversed and remanded.*