Brinkerhoee, J.
On approaching the questions presented by the demurrer to the petition in this case, and attempting to examine them in the light of the decisions which appear to have a hearing upon them, those decisions seem, at first, to involve no little contradiction and uncertainty. But this seeming uncertainty and contradiction in the cases is owing to the want of a classification of the general subject into certain distinct branches of inquiry, into which the general subject naturally falls. When this classification is made, the seeming contradictions in the cases almost wholly disappear; and the cases drop in under the different heads of inquiry to which they properly belong, and assume a real and very satisfactory consistency with each other..
In considering the relative rights and obligations of owners-of adjoining lands in respect to water passing from the lands of one to those of the other, the subject naturally divides itself into four branches of inquiry; and this on account of the four different modes in which water may, and sometimes-does, pass from one tract of land to another.
1. In respect to surface streams which flow in a permanent, distinct and well-defined channel from the lands of one owner to those of another.
2. In respect to surface waters — however- originating — • which, without any distinct or well-defined channel, by attraction, gravitation or otherwise, are shed and pass from the lands of one proprietor to those of another.
*299 3. Subterranean streams which flow in a permanent, distinct and well-defined channel from the lands of one to those of another proprietor.
4. Subsurface waters which, without any permanent, distinct or definite channel, percolate in mere veins, ooze, or filter from the lands of one owner to the lands of another.
The whole subject, in all its branches, is governed by two general and fundamental maxims; which are — first, that the estate, usufruct, and dominion of the owner of lands extend from the sky to the lowest depths of the earth;' second, that every man shall so use his own as not to injure his neighbor These maxims, however, like most general rules, are, in their application, subject to modifications or exceptions, growing out of certain great principles of natural right, anterior in their origin,' and superior in their obligation, to all individual proprietorship; out of certain paramount considerations of public policy; and from the established principle, that, however great or obvious the damage may be, the law will regard as an injury that only which contravenes or interferes with a recognized legal right.
Thus (1.), in regard to the branch of inquiry first above named, to-wit, surface streams flowing in a permanent, distinct, and definite channel, it is now too well settled to require the citation of authorities for its support, that, notwithstanding the maxim which afiirms the absolute and unlimited dominion of the proprietor of the soil upward and downward, the proprietor below has, in the absence of any modification of relative rights by contract or prescription, no right to throw the water back on him above, and has the right to receive it from the proprietor above substantially undiminished in quantity and uncorrupted in quality; and this right arises, not from any supposed grant or from prescription,, but ex jure naturae, and for the reason, that surface streams of flowing water are the gift of Providence, for the benefit of all lands through which they flow, and as such their usufruct is.appurtenant to the lands through which they flow.
2. In respect to surface waters which, without any permanent, distinct and definite channal, are shed, or, by any means *300 pass, from the lands of one to those of another proprietor— it seems now to be the established doctrine, that, unless some right derived from actual contract or positive legislation intervene, the doctrine.which asserts the absolute dominion of proprietors, applies to its full extent and without exception Paramount considerations of public policy forbid the acquisition of any right in such waters by an adjoining proprietor on the ground of prescription. Otherwise than on the ground of actual contract or positive legislation, he can have no legal right in such waters; and, whatever damage he may suffer by reas'on of the exercise of his neighbor’s rightful command over his own soil, is damnum absque injuria. To thi3 effect the cases are nearly uniform, and seem to rest on a broad and sound basis of reason and policy. Rauston v. Taylor, 11 Exch. Rep. 369; Broadbent v. Ramsbotham, Id. 602; Luther v. Winnisimmet Company, 9 Cush. 171; Wheatley v. Baugh, 25 Penn. St. Rep. (1 Casey) 528. The only case that I can find, which holds a contrary doctrine, is Balstonv, Bensted, 1 Camp. 463. But that was a case at nisi prius, doubtless hastily decided, and which, in the latter cases, has not been followed or regarded as authoritative.
3. In respect to subsurface streams, which, though under ground, yet flow in a permanent, distinct, and well-defined channel, unmixed with the earth through which they flow.
Such streams, it is notorious, are occasionally found to exist in various geolsgical formations; though they are more abundant, both in frequency and volume, in limestone regions. As is said by Lewis, C.J., in Wheatley v. Baugh, above cited, “ in limestone regions streams of great volume and power pursue their subterranean courses for great distances, and then emerge from their caverns, furliishing power for machinery of every description, or supplying towns and settlements with water, for all the purposes of life.” And he adds, that “ when the filtrations are gathered into sufficient volume to have an appreciable value, and to flow in a clearly-defined channel, it is generally possible to see it, and to avoid diverting it without serious detriment to the owner of the land through which it flows;” and he expresses the opinion, that *301 ■“ to say that these streams might be obstructed or diverted, merely because they run through subterranean channels, is to forget the rights and duties of man in relation to flowing wetter.” He is, evidently, of opinion that subterranean streams, as distinguished from subterranean percolations, are governed by the same rules, and give rise to the same rights and obligations, as flowing surface streams. But the case he was considering did not necessarily involve any question in reference to clearly-defined subterranean streams; and his opinion, therefore, though certainly entitled to great weight, as the opinion of a jurist who evidently has very thoroughly considered the general subject, and has discussed it with great and comprehensive ability, can hardly be regarded as authoritative.
To this,branch of inquiry, too, the case of Smith v. Adams, 6 Paige, 485, is clearly referable. That was a bill in chancery, by an owner below, to restrain, by injunction, an owner above from diverting a portion of the water of a subterranean stream which, on the complainant’s land, and a few feet from the line between the parties, issued from a channel in a ledge of slate rock, and there formed a spring ; and which subterranean stream'the defendant, on his own land, though but a few feet above where it issued on the complainant’s land, had tapped, and, by means of an aqueduct of logs, had diverted a portion of its waters to his own purposes, and out of their natural channel. The chancellor expressed the opinion that the partial diversion of the water of the underground stream was wrongful; but, inasmuch as the small quantity of water diverted, and the trifling amount of damage done, brought the ease within the rule of de minimis, he dismissed the bill, and left the complainant to his remedy at law.
Parke, B., in Dickinson v. The Grand Junction Canal Company, 9 E. L. & E. Rep. 521, also speaking of surface streams, says, “ when water is on the surface, the right of the owner of adjoining land to the usufruct of that water is not a doubtful matter of fact — it is public and notorious — and such a right ought, as a matter of course, to be respected by every one; and, indeed, if the course of a subterranean stream *302 were well known — as is the case■ with many, which sink underground, pursue for a short space a subterranean course, and then emerge again — it never could be contended that the owner of the soil, under which the stream flowed, could not maintain an action for the diversion of it, if it took place under such circumstances as would have enabled him to recover if the stream had been wholly above ground.” And it will be observed that both Baron Parke and Chief Justice Lewis intimate the opinion, that, in order to bring subterranean streams within the rules which govern surface streams, their existence and their course must be, to some extent, known or notorious. And it seems to me that, if the question should ever arise, the rights and obligations of adjoining proprietors would have to be subjected to this limitation; and this for the reason — which will be more fully noticed hereafter — that the law can not properly limit the ordinarily absolute dominion of the owner of the soil, in respect to things concealed and hidden in the bowels of the earth, nor recognize an adjoining proprietor as having claims upon, or rights in, a thing passing under the surface of his neighbor’s land, the existence of which was first revealed by the very act which would constitute the subject matter of his complaint.
But ,all the opinions to -which I have adverted under this head of the general subject, are obiter dieta; the questions considered did not necessarily arise in any of the cases in which the opinions were expressed — not even in the case of Smith v. Adams; they were there, as they are here, rather matters of curious speculation than otherwise; though the subjects to which they relate must necessarily be noticed, in order to a proper classification of the general subject, and a more ready apprehension of the distinctions which it involves. But the questions remain undecided; and we leave them where we find them — open to future consideration and adjudication, under the further lights which the future may develop.
4. We come now to the last branch of inquiry named in our classification; to-wit, as to the rights, if any, which a land owner has — in the absence of anything arising from either express contract or positive legislation — in respect to *303 subsurface waters, wbicb, without any distinct, definite, and known channel, ooze, filter, or percolate in small veins from the lands of his neighbor into his own.
It is under this head that the questions made by the demurrer to the petition in this case clearly fall. For it is nowhere alleged in the petition that the waters, the abstraction and detention of which is complained of, reach the lands of the plaintiff in any distinct, definite, or known channel, either above or below the surface; but, on the contrary, the petition describes them as a spring which “issued and oozed” out of the land of the plaintiff, and from which spring a rivulet ran and meandered over and through the plaintiff’s lands. Distinct and well-defined subterranean streams of water are comparatively rare; their existence, in any case, can not properly be presumed; and the most liberal construction which can be given to the language of this petition will not justify us in considering it as alleged, that any such stream passes from the lands of defendant to those of the plaintiff; and there is no claim that the natural rights of the parties, growing out of their relations of proximity to each other, have in any way been modified by either contract or legislation. The plaintiff is bound to state facts which — the statement being liberally construed — constitute a cause of action; and? if everything which he avers in his petition may be true, and yet no cause of action exist, then the demurrer to the petition was rightfully sustained.
What was the object for which the “hole,” of which the plaintiff complains, was designed, we are not fully informed. It may have been a well for domestic use, or for watering stock; or a surface reservoir for watering stock — not uncommon in some parts of this state; it may have been a cellar, stone-quarry, mine, or coal-pit; a salt well or an oil well; or it may have been a fish-pond, or a miniature water-view, for purposes of ornament, made in an effort in landscape gardening. For aught that appears in the petition, it may have been any of these, and embracing in its object also the malicious design to injure the plaintiff, as averred in the petition. A.nd it certainly is poss:7>le, that it may have been dug by the- *304 ■defendant from motives of unmixed malice, without any object, and, when done, incapable of answering any end, either of ornament, convenience, or profit, connected with the enjoyment and use of his property. But this is not averred, .and will not be presumed. And such a case, should it ever arise, is reserved for future consideration.
The question then is, whether — in the absence of all rights lerived either from contract or legislation — a land owner can have any legal claims in respect to subsurface waters which, without any distinct and definite channel, ooze, filter, and .percolate from adjoining lands into his own, when such waters are diverted, retained, or abstracted by the owner of such adjoining lands in the use of his property, for any object of either taste or profit, even though the use maybe accompanied by a malicious intent to injure his neighbor by means of such use ?
Whatever points of casuistry may arise out of this question, cognizable in the court of individual conscience, under the perfect law of Christian morals, ive are of opinion that the law of the land can recognize no such claims; and that, subject only to the possible exception of a case of unmixed malice, the maxim, “ cujus esi solum ejus est usque ad coelum ét ad infernos,” applies to its full extent; and whatever damage may result from the exercise of this absolute right ■of property, to adjoining proprietors from the loss of such percolating subsurface waters, is damnum absque injuria. With the exception of the nisi prius decision of Lord Ellen-borough, in Balston v. Bensted, before referred to, and an obiter opinion of Parke, B., in Dickinson v. The Grand Junction Canal Co., supra, the current of decisions, to this effect, both in England and the United States, is uniform and consistent. I say, the opinion of Parke, B., in Dickinson v. The Grand Junction Canal Co., was obiter; for, on an inspection of that case, it will be seen, that the plaintiff’s rights, as there claimed by him, well rested on a basis of express contract; and there was no occasion to pass upon.any principle of natural right growing out of the other relations of the parties.
The reasoning on which this current of decision proceeds, *305 is entirely satisfactory to us, and will be developed as we proceed with a brief review of the inore prominent case's.
The first case arising in this country, and bearing directly on the question before us, of which we are- aware, is Greenleaf v. Francis, 18 Pick. 117. It was an action on the case. The plaintiff had dug a well in her cellar, two or three feet from the line between her land and that of the defendant, in which the water rose to the surface of the well. Within less than twenty years thereafter, the defendant, after ascertaining the exact situation of the plaintiff’s wed, dug a well for his own use, on his own land, about the same distance from the line, and as near to it as the party walls between the cellars would admit; in consequence of which — it would seem — the defendant obtained a good well; but the plaintiff’s well became -dry. On the trial of the case, “ the plaintiff requested the judge to instruct the jury, that if they were satisfied that the defendant so placed his well, with the design and intent thereby to draw off the water from the. plaintiff’s well into his own, they should return a verdict for the plaintiff. But the judge instructed the jury, that the defendant had a legal right to dig a well upon any part of his own land for the purpose of obtaining water for his own use; that if he dug his well where he did, for this purpose, he was justified in so doing, although the effect might be to diminish the water in the plaintiff’s well; that if he dug the well where he did, for the purpose of injuring the plaintiff, and not for the purpose of obtaining water for his own use, he was liable in this action; but that if he thus dug his well, for the purpose of accommodating himself with water, he was not liable for so doing, even if he, at the same time, entertained hostility toward the plaintiff and a desire to injure her, and these feelings were thereby gratified.” The jury, under these instructions, having returned a verdict for the defendant, and a motion for a new trial having been reserved for decision by the whole court, it was held that there was no error in the-instructions given to the jury, and a judgment was rendered Upon the verdict. And Putnam, J., in delivering the opinion of the court, among other things, says — “ there is not evidence■ *306 of any adverse use or possession at all. For the defendant had no means of knowing that the plaintiff’s well was supplied by springs in the defendant’s soil, until the defendant dug for water there for his own use. * * * Indeed there is nothing in the ease at bar, which limits or restrains the owners of these estates, severally, from having the absolute dominion of the soil, extending upward and below the surface so far as each ■pleases.” And, by way of support to the opinion expressed, that “ there is not evidence of any adverse use or possession at all,” he adds — “he” (the defendant) “ sustained no injury by the use which the plaintiff made of the water which she found in her own well;” thus suggesting the idea — more fully noticed hereafter — that the doctrine of prescription, or presumption of grant from lapse of time, can have no proper application to a case where the party against whom it is sought to apply it, must, from the nature of the case, be unconscious of, or at least uncertain in regard to, any injury or infringement of his rights.
The next case, in the order of time, is Roath v. Driscoll, 20 Conn. 533. This was a bill in chancery, complaining of an injury to the plaintiff, by means of a diversion of water by the defendant, and asking for an injunction. And the question made and considered was — “ can one of two adjoining proprietors, by first opening a watering place, prevent other persons from doing the same, on their own land; though, by so doing, water is prevented from percolating the land so as to supply the first made reservoir.” The question was answered in the negative. And Ellsworth, J., discussing the case, and delivering the opinion of the court, says — “ Nothing is gained by a mere continued preoceupancy of water under the surface. Why should any advantage be gained by preoccupancy? Each owner has an equal and complete right to the use of his land, and to the water which is in it. Water, combined with the earth, or passing through it, by percolation, or by filtration, or chemical attraction, has no distinctive character of ownership from the earth itself; not more than the metallic oxids of which the earth is composed. Water, •whether moving or motionless in the earth, is not, in the eye *307 -of the law, distinct from the earth. The laws of its existence and progress, while there, are not uniform, and can not be known or regulated. It rises to great heights, and moves collaterally, by influences beyond our apprehension. These influences are so secret, • changeable and uncontrolable, we can not subject them to the regulations of law, nor build upon them a system of rules, as has been done with streams upon the surface.” * * * * * “ Further, we may say, that by general consent of mankind, which is to be inferred from the nature of the right itself, each person must be left to enjoy any natural advantage belonging to his own land; and water, appearing and standing, either naturally or by artificial means, but never constituting a running stream, is such a natural advantage; were it otherwise, one man, by sinking a well, though comparatively unimportant, might prevent the sinking of other wells, and the improvement of the neighborhood, by draining marshes, etc., and even the opening of mines of metal or coal; as the water might not percolate, with the same freeness or abundance as before. Beside, no man is bound to know that his neighbor’s well is supplied by water percolating his own soil; and he ought not, therefore, to be held-to lose his rights, by such continued enjoyment. He can not know that the first well requires any other than the natural and common use of water under the surface; nor can he know from whence the water comes; nor by what means it appears in one place or the other; nor which of the persons who first or afterward opens the earth, encroaches upon the right of the other. The law has not yet extended beyond open running streams. Nor can any light be obtained from the law of surface streams. Such streams are recognized as private property, and their use is regulated by principles of obvious equity and necessity. Their nature is defined; their progress over the surface seen, and known, and uniform. They are not in the secret places of the earth, and a part of it; nor is there any secrecy in the influences which move them. As soon as they appear and pass over the surface, they assume a distinct character, and are subject to the great law of gravitation. The purchaser *308 of land knows what he purchases, and what control he can exercise over such a stream, and what are the rights of those above or below him.”
Next comes the ease of Chatfield v. Wilson, 28 Verm. 49. This is a well considered and strongly reasoned case, both on principle and authority; and it is there held, that “ there are no correlative rights existing between the proprietors of adjoining lands, in reference to the use of the water in the earth, ■ or percolating under its surface. Such water is to be regarded as part’of the land itself, to be enjoyed absolutely by the proprietor within whose territory it is; and to it the law governing the use of running streams is inapplicable.” And that “ an act legal in itself, and which violates no right, can not be made actionable on account of the motive which induces it.” The case seems to go to the full extent of holding that the act of detaining or diverting subsurface percolating waters from an adjoining proprietor, gives him no right of action, though the act be one, under the circumstances, of unmixed malice.
The cases which I have thus far noticed, are all cases in which the injury complained of related to wells or reservoirs artificially provided. But the next case—Ellis v. Duncan, 21 Barbour’s S. C. R. 230—relates to a spring and running stream. It is there held, that “ the owner of a farm may dig a ditch to drain his land, or open and work a quarry upon it, although by so doing he^ intercepts one of the underground sources of a spring on his neighbor’s land, which supplies a small stream of water flowing partly through the land of each, and thereby diminishes the natural supply of water, to the injury of the adjoining proprietor.” And that “ the rule that a man has a right to the free and absolute use of his property, so long as he does not directly invade that of his neighbor, or consequentially injure his perceptible and clearly-defined rights, is applicable to the interruption of the subsurface supplies of a stream, by the owner of the soil; and the damage resulting from such an interruption, is not the subject of lega^l redress.” And Strong, J., delivering the opinion of the court in the case, says — “ there can be no doubt of the *309 correctness of the injunction, sic utere tuo ut alienum non laedas; but I have frequently had occasion to remark that it refers to such injuries. only as the law will redress, and not to the large class which are usually denominated damnum absque injuria.”
The next case has been already incidentally referred to— that of Wheatley v. Baugh, 25 Penn. St. Rep. 528—in which Chief Justice Lewis discusses the whole subject with a'clearness and comprehensive ability certainly not exceeded by anything else which we have been able to find in the books. It is held in that case, that “ where a spring depends for its supply upon percolations through the land of the owner above, and, in the use of the land for mining, or other lawful purposes, the spring is destroyed, such owner is not liable for the damages thus done, unless the injury was occasioned by malice or negligence. Nor would the enjoyment of the spring for twenty-one years raise any presumption of a grant; for no presumption would arise against the owner until it wa,s shown that the exercise of the privilege interfered with his rights in such manner as to entitle him to legal redress.”
In discussing the principles involved in the case, the learned chief justice says: “ Percolations spread in every direction through the earth; and it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land. Accordingly, the law has never gone so far as to recognize in one man a right to convert another’s farm to his own use for the purpose of a filter. Such a claim, if sustained, would amount to a total abrogation of the right of property. No man could dig a cellar, or a well, or build a house on his own land, because these operations necessarily interrupt the filtrations through the earth. Nor could he cut down the forest and clear his land for the purposes of husbandry, because the evaporation which would be caused by exposing the soil to the sun and air would inevitably diminish, to some extent, the supply of water which would otherwise filter through it. He could not even turn a furrow for agricultural purposes, because this would, partially, produce the same result. Even if this right were admitted to exist, the difficulty of ascer *310 taining the fact of its violation, as well as the extent of it, would be insurmountable.”
Turning now to the English cases, not already noticed, we ■come first to Acton v. Blundell, 12 M. & W. 324. This case was thoroughly argued and considered; and it was there held, that “the owner of land through which water flows in a subterranean course, has no right or interest in it which will enable him to maintain an action against aland owner, who, in carrying on mining operations in his own land in the usual manner, drains away the water from the land of the first mentioned owner, and lays his well dry.” And the quaere is added, “ if the well had been ancient, whether there would have been any difference ?”
The next, and, I believe, the only remaining case to be found in the English books, is Chasemore v. Richards, decided in the exchequer chamber, on error to the court of exchequer in 1857. 2 Hurlstone & Norman’s Ex. R. 168. Except that there was no ingredient of malice found to exist in the acts of the defendant in that case, it was entirely analogous to the case before us, and involved the same questions. It was there held, that “ the owner of a mill on the banks of a river, can not maintain an action against a land owner, who,” without malice, but having “reasonable means of knowing the probable and natural effects ” of his acts, “ sinks a deep well on his own land, and, by pumps and steam engines, diverts the underground water which would otherwise have percolated the soil and flowed into the river by which, for more than sixty years, the mill was worked.” The case was strongly argued before seven judges of the exchequer chamber, and Coleridge, J., alone dissented. Unfortunately, a copy of the latest volume of House of Lords’ Cases has not yet.reached our library; but, from a copy of the Weekly Law Gazette, with which counsel have furnished us, we learn that this ease was carried to the house of lords on error, and there unanimously affirmed; •Lord Wesleydale (late Parke, B.), whose dictum in Dickinson v. The Grand Junction Canal Company, before noticed, was thereby overruled, concurring in the affirmance, though somewhat doubtingly and reluctantly.
*311 From this running abstract of the cases bearing immediately upon the question before us, it will be seen, that though the question is one of no little novelty, niceness and difficulty, yet the current of decision is singularly uniform and consistent. It is evident, that if the overwhelming current of authority is to be regarded, the judgment of the court of common pleas must be affirmed. But, as I have already said, the reasoning on which this course of decision proceeds, is, to our minds, as satisfactory as the cases themselves are uniform and consistent.
The reasoning is briefly this: In the absence of express contract, and of positive authorized legislation, as between proprietors of adjoining lands, the law recognizes no correlative rights in respect to underground waters percolating, oozing or filtrating through the earth; and this mainly from considerations of public policy. 1. Because the existence, origin, movement and course of such waters, and the causes which govern and direct their movements, áre so secret, occult and concealed, that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertaintys and would be, therefore, practically impossible. 2. Because any such recognition of correlative rights, would interfere, to the material detriment of the common wealth, with drainage and agriculture, mining, the construction of highways and railroads, with sanitary regulations, building and the general progress of improvement in works of embellishment and utility.
That the doctrine of prescription, or presumption of grant from lapse of time, can have no proper application to the ■question: 1. Because the party against whom the doctrine would have to be applied, could not be reasonably required to enter his caveat against the appropriation of a thing so hidden and obscure as is percolating underground water; and 2. Because the appropriation of such waters by an adjoining proprietor, is no infringement of his rights, so as to become the subject of legal redress, until such time as he himself has oe'Casion to appropriate them.
And, as an act unlawful in itself, resulting in injury to an *312 other, whatever may have been the motive with which it was done, is none the le.ss the subject of legal redress; so the act done, t'o-wit, the using of one’s own property, being lawful in itself, the motive with which it is done — whatever it may be as a matter of conscience — is, in .law, a matter of indifference.
It is hardly necessary to add, that this case does not include, and, in deciding it, we by no means intend to preclude,, questions which may arise in a class of cases in which a land owner, by positive acts, poisons or corrupts the waters which percolate from his lands to those of his neighbor. Such cases are clearly distinguishable from this, and to them the considerations of public policy which govern this case do not necessarily apply. Wood v. Wand, 3 Exch. R. 748.
The judgment of the court of common pleas, sustaining the demurrer to the petition, will be affirmed.
Scott, O.J., and Sutliee, Peck, and Gholson J J., concurred.