## LEWIS CHATFIELD v. WALTER M. WILSON.

*Underground water. Mere motive not actionable.*

There are no correlative rights existing between the proprietors of adjoining lands, in reference to the use of the water in the earth, or percolating under its surface. Such water is to be regarded as part of the land itself, to be enjoyed absolutely by the proprietor within whose territory it is; and to it the law governing the use of running streams is inapplicable.

An act legal in itself, and which violates no right, cannot be made actionable on account of the motive which induces it.

ACTION ON THE CASE for the disturbance of a water course. The declaration contained three counts, the first and second charging the defendant with having lowered and changed the channel of a brook, which divided the farms of the plaintiff and defendant, and diverting the water therein; and the third complained of an interference by the defendant, with the natural flow or passage, by percolation, of the water through the defendant's land, to the plaintiff's, by means of which a reservoir or tub on the plaintiff's land was supplied with water. Plea, the general issue; trial by jury, March Term, 1855,—POLAND, J., presiding.

The plaintiff's evidence tended to prove that the defendant's  farm lay north and east of the plaintiff's; and that the plaintiff's farm and the defendant's land lying north of it were divided by a small brook, which came from a spring further east on the defen-  dant's land, and run westerly, and that sometimes, in the summer, the brook would become wholly dried up. At the north-east corner of the plaintiff's farm, and on the south side of the brook, there was a small piece of level ground, some ten or fifteen feet wide, and extending up and down the brook about two rods, which was partly on the plaintiff's land, and partly on the defen- dant's land lying east; that this piece of flat ground was wet, porous and spongy, so that by digging into it the cavity would fill with water; that, prior to the act of the plaintiff in laying his aque- duct as hereinafter stated, there was no water apparent on the surface of this piece of flat ground, and no appearance of a spring of water there, but that the water in the soil came from the brook above by percolation through the soft soil and upon the surface of the flat rock under the soil; that some four or five years (previous

to the spring of 1852, the plaintiff, by leave of the defendant, dug a hole in this piece of flat ground, a few feet over the line on the defendant's land, and in this hole placed a tub which filled with water, and laid an aqueduct of lead pipe from the tub to his buildings, and from that time up to the spring of 1852, procured in this manner an ample supply of water for his buildings, for which he paid the defendant annually the sum of one dollar and fifty cents; that in the spring of 1852, there was some difficulty between the plaintiff and the defendant, and the defendant notified the plaintiff to remove his tub and pipe from the defendant's land, and the plaintiff, accordingly, took up his tub, and placed it in a hole in the flat ground on his own side of the line, but within a short distance of it, and also very near the bank of the brook; that his lead pipe was placed in this tub, and that he continued to be well supplied with water until about the first of July, 1852; that the tub, when placed on the plaintiff's own land, was sunk to the depth of a foot or more below the channel of the brook, and that the tub and aqueduct were supplied with water by the filtration of the water from the brook directly, and also through the soil and under the soil, on the defendant's side of the line. The plaintiff's evidence also tended to prove that about the 1st of July, 1852, the defendant dug away and lowered the channel of said brook, beginning some two or three feet above, and east of the plaintiff's corner, and extending twelve or fifteen feet below, so that the water of the brook was thereby made to run in the new channel, two or three feet further north, and about a foot lower than before; that the defendant also dug a channel from the hole where the plaintiff's tub had formerly stood in his land, out into the channel of the brook, so as to carry all the water which collected there into the new channel he had made for the brook, above the plaintiff's corner; and that the defendant filled up the side of this channel, from the hole or spring to the brook on the side next to the plaintiff's tub with dry hard earth, so as to prevent any filtration of water, through or under the soil on his land, to the plaintiff's tub, and that these acts of the defendant, prevented the water from accumulating in the plaintiff's tub, either *from the brook directly* or *through or under the soil of the defendant's land, and that the plaintiff thereby was wholly deprived of water by his said aqueduct;* and that these acts of the defen-

dant were not necessary, and were not done by the defendant with any purpose of supplying himself with water, for any purpose, but solely with the design of thereby depriving the plaintiff of water by his aqueduct. The defendant claimed, and his evidence tended to prove that, previous to the plaintiff's putting his tub and pipe into the defendant's land, as above stated, there was an open visible spring of water, where the tub was placed, the water from which flowed north into the brook on the defendant's land, in a natural channel, and that there was never any such flow of the water of the brook through or under the soil on the defendant's land, as the plaintiff claimed. The defendant also claimed that the plaintiff's tub, after the same was placed on his own land, was not supplied with water by the natural percolation of the water through the soil, either from the brook, or from the water of this land or spring, but that it was supplied with water from the defendant's spring, through a blind or underground ditch, which the plaintiff had made without his license or permission, and that the only effect of his acts, of which the plaintiff complained, was to restore the flow of the water to its natural condition, as it was before anything had been done by the plaintiff. The defendant also claimed that what was done by him, was done for the purpose of providing water for his pasture, and not to injure the plaintiff; and he also denied making any change of the channel of the brook, as claimed by the plaintiff. The charge of the court relative to the turning of the channel of the brook was not excepted to. In relation to the other part of the case, the court charged (among other things not excepted to,) that the defendant had a right to prevent the flow or escape of water from his own land to the plaintiff's tub by any artificial means that the plaintiff had used to obtain it, and that he might lawfully do all that was necessary to restore the water to its natural flow, and that it was not material what his purpose or motive was; and that the defendant would not be liable for any act of his, upon his own land, in preventing the natural flow or escape of water, in or under the soil from his land to the plaintiff's, provided such act was done for the purpose of reasonably providing himself, or his farm or cattle, with a supply of water; but if they found that the acts of the defendant did prevent the *usual* and *natural* flow of the water, in or under the

ground from the defendant's soil to the plaintiff's, and that these acts were done by the defendant solely with the purpose of injuring the plaintiff, and depriving him of water, and not with any purpose of usefulness to himself, then he would be liable to the plaintiff for such damages as he thereby sustained. The jury returned a verdict for the plaintiff on all the counts in his declaration. To so much of the charge as is above detailed, the defendant excepted.

——— ——— for the defendant.

There was error in the charge that, if the defendant prevented the percolation in order to deprive the plaintiff of the water, without any purpose of usefulness to himself, he would be liable, &c.

In the well-considered case of *Acton* v. *Blundell*, 12 M. & W. 324, no such distinction is made, and the doctrine of the absolute right of the owner of the soil, to the entire control, at will, of this species of water, on his own land, is fully established. See also *Greenleaf* v. *Francis*, 18 Pick. 117.

If underground water in its percolations and filtrations, from its peculiar nature, and from our ignorance of its course, and the laws that control it, is not subject to the law as it applies to running water, then that of it which is on any man's land, like any other thing which makes the soil, or is contained in it, is absolutely the owner's.

The entire dominion of the owner over his own soil is settled beyond question. *Thurston* v. *Hancock*, 12 Mass. 220 ; *Panton* v. *Holland*, 17 Johns. 92.

If a man does an illegal act with a *good* motive, he is nevertheless liable to an action ; so, if he does a legal act with a *bad* motive, no action will lie against him. *Hathaway* v. *Allen*, Brayton, 152. Buller's N. Prius 14. *Runnels* v. *Bullen*, 2 N. H. 532. *Greenleaf* v. *Francis*, 18 Pick. 117. In this last case the court say, " every one has the liberty of doing in his own ground whatsoever he pleases, *even though it should occasion to his neighbor some other sort of inconvenience.*"

*O. H. Smith* and *F. V. Randall* for the plaintiff.

The flowing of the water in its natural course to the plaintiff's land was an incident thereto, as much as the right to have the soil

itself, in its natural state, unaltered by the acts of the defendant, who could not lawfully dig, so as to deprive it of the support of his land.   *Tyler et al.* v. *Wilkinson et al.* 4 Mason 401.

The defendant had a right to use the water of the spring, and the water of the brook in common with the plaintiff, but he was bound to exercise that right in a reasonable manner ; and if he diverted the water maliciously or wantonly, to the injury of the plaintiff, he would be liable in damages.   *Twiss* v. *Baldwin*, 9 Conn. 291.   *Hay* v. *Stennell*, 2 Watts 327.   *Greenleaf* v. *Francis*, 18 Pick, 117.   Gale and Whatley on Easements, 243–4 n. *Platt* v. *Johnson & Root*, 15 Johns. 213.   *Panton* v. *Holland*, 17 Johns. 92.

The opinion of the court was delivered, at the circuit session in September, 1856, by

BENNETT, J.   This is the first time, within my knowledge, that the question has ever come before our courts, in relation to the rights of adjoining proprietors of lands to water percolating under the surface, through wet and porous ground, and the case may be considered somewhat important in principle, as well as novel, in this state.   The court below, on this point, told the jury, in sub-stance, that the defendant had the right to prevent the escape of water from his own land to the plaintiff's tub, which he had sunk on his own land, and that he might lawfully do all that was neces-sary to restore the water to its *original* flow, and that it was not material what his motive was ; and that he had the right, on his own land, to prevent the natural flow or escape of water, in or under ground, from his to the plaintiff's land, provided it was done to secure, in a reasonable manner, a supply of water for himself, his farm, and cattle; but if done *solely* to injure the plaintiff, and deprive him of water, and not to benefit himself, then he would be liable.   This charge is evidently based upon the ground that there were certain *correlative rights* existing between these parties, in the use of the water percolating in and under the surface of the earth.   The rules of law which govern the use of a stream of water, flowing in its natural course over the surface of lands be-longing to different proprietors, are well settled, and the *correlative rights* of the adjoining proprietors are clearly defined.   Each pro-

prietor of the land has the right to have the stream flow in its natural course over his land, and to use the same as he pleases for his own purposes, not inconsistent with a similar right in the pro- prietors of the land above or below him, but no proprietor above can diminish the quantity or injure the quality of the water, which would otherwise naturally descend, nor can any proprietor below throw back the water · upon the proprietor above, without some li- cense or grant. But we think the law governing running streams is not applicable to underground water, and that no light can be obtained from the law of surface streams ; and if it is to be estab- lished that there are *correlative* rights existing, between adjoining proprietors of land, to the use of water percolating the earth, an entire new chapter in the law will be necessary to define what these rights are, and to put them on some tangible and practical ground, that the rules concerning them may be applied to common use. But from the very nature of the case, this seems imprac- ticable. ,

The laws of the existence of water under ground, and of its progress while there, are not uniform, and cannot be known with any degree of certainty, nor can its progress be regulated. It sometimes rises to a great height, and sometimes moves in collat- eral directions, by some secret influences, beyond our comprehen- sion.

The secret, changeable, and uncontrollable character of under- ground water, in its operations, is so diverse and uncertain that we cannot well subject it to the regulations of law, nor build upon it a system of rules, as is done in the case of surface streams. Their nature is defined, and their progress over the surface may be *seen* and *known*, and is *uniform*. They are not in the earth and a part of it, and no secret influences move them, but they assume a dis- tinct character from that of the earth, and become subject to a cer- tain law,—the great law of gravitation.

There is, then, no difficulty in recognizing a right to the use of water flowing in a stream as *private property*, and regulating that use by settled principles of law. We think the practical uncer- tanties which must ever attend subterranean waters is reason enough why it should not be attempted to subject them to certain and fixed rules of law, and that it is better to leave them to be

enjoyed absolutely by the owner of the land, as one of its natural advantages, and in the eye of the law a part of it, and we think we are warranted in this view by well-considered cases.

In the case of *Acton* v. *Blundell et al.*, 12 M. & W. 324, it was held that the owner of land, who had made a well in it, and thereby enjoyed the benefit of underground water, had no right of action against an adjoining proprietor, who, in sinking for and get-ting.coal from his own soil, in the usual and in a proper manner, caused the well to become dry. A query is added whether it would have made any difference if the well had been enjoyed by the plaintiff for more than twenty years. In the case of *Koath* v. *Driscoll*, 20 Conn., the doctrine is fully advanced that no right is gained by a mere continued preoccupancy of water under the sur-face by any artificial means for a period of fifteen years or more. The court say, "each owner has an equal and complete right to the use of his land and to the water which is *in it ;*" and they say "the water combined with the earth, or passing through it by perco-lation, or by filtration, or chemical attraction, has no *distinctive character of ownership* from the earth itself, any more than the metallic oxyds, of which the earth is composed," and they further add, " water, whether moving or motionless, *in the earth*, is not, in in the eye of the law, distinct from the earth." If it is true that subterranean water is to be treated as a part of the earth, it must follow that there are no *correlative rights* in the enjoyment of such water, between adjoining proprietors of land, and both the case in the 12th of M. & W. and 20 Conn. proceed upon that ground. The case of *Greenleaf* v. *Francis*, 18 Pick. 117, goes upon the same principle, and it was there held that no action would lie against a man who dug a well on his own land, although he thereby took the water from his neighbor's well, in the absence of all right acquired by grant, or an adverse user. The case is really put upon the ground that " every one has the liberty of doing, on his own ground, whatever he pleases, even though he occasion some damage to his neighbor ;" and the court say, " there is nothing in the case, then at bar, which limited or restrained the owners of the estates severally, from having the absolute dominion of the soil ex-tending upwards, and below the surface, as far as each pleased." This, in effect, negates the position that there can be, upon com-mon principles *correlative rights* in underground water.

The case of *Dickinson* v. *The Grand Junction Canal Company*, 9 Eng. Law and Eq. 520, is not opposed to the views taken in the foregoing cases. In that case the water was proved to have been taken from the river, after it formed a part of the stream, not by reasonable use by another riparian proprietor, but by digging a well; and this was treated as a diversion of *surface water*, and *actionable* at common law; and, in regard to the abstraction of the water which never did form part of the river, but had been prevented from doing so by the sinking of the wells, it was held, that the mill-owners, being entitled to the benefit of the stream in its natural course, were deprived of part of that benefit, if the natural supply of the stream was cut off, and might have their action, whether the water cut off was a part of an underground water course, or percolated through the strata of the earth. In this case the injury complained of was the diminution of water in a surface stream, and the law applicable to surface streams was applied. The cases, cited by the plaintiff's counsel, which relate to surface streams can give little or no aid in the question before us. The case of *Smith* v. *Adams*, 6 Paige 435, is also a case where the underground water, which was cut off by an excavation on the defendant's land, supplied a spring, and this spring caused a flow of surface water, and the decision was, that the person who had the right to the use of the water in its natural course, or by a prescriptive right, out of its natural course, and was injured by the excavation, might have redress for the injury. Here, too, the person complaining was injured in his rights to the use of flowing water. Such is also the case in *Balston* v. *Benstead*, 1 Campbell 463, and no doubt other cases of a like character may be found in the books.

There is no ground to claim that the plaintiff has been injured in his right to the use of water in a surface stream flowing in its natural channel, so far as the case is now before this court, and he can claim no prescriptive right to the water.

The tub was sunk by the plaintiff on his own land, in 1852, and as his evidence tended to prove, a foot or more below the channel of the brook, and that, from this tub, the water was taken by artificial means for the use of the plaintiff; and the case shows that the plaintiff's evidence tended to prove that this tub was supplied with water, which filtrated under ground from the brook, and also from the adjoining land of the defendant; and the case, so far as it is

sent up to us, only concerns the right of the defendant to cut off the *filtration* of the water from his own land to the plaintiff's tub by artificial means, and the consequences, if *wantonly done.*

This then, is fairly a question, as to the rights of the plaintiff in underground water. Putting this case, then, upon the ground that the water in question, while in the earth of the defendant, though percolating through it, is not distinct from it, in the eye of the law it becomes an important inquiry whether the act of the defendant, in the obstruction of the under ground water upon his own premises, can be made actionable, simply upon the ground that the motive was bad which induced it. The act of the defendant in the obstruction of the water, being in itself lawful, could not subject the defendant to damages unless, by reason thereof, some right of the plaintiff has been violated. The maxim, " *Sic utere tuo, ut alienum non laedas,*" applies only to cases where the act complained of violates some legal right of the party; and it has been attempted to be shown that this underground water cannot be made the subject of *correlative rights.* It is said in Comyn's Digest, under the head of Nuisance, that an action on the case does not lie for the *reasonable* use of any right, though it be to the annoyance of another. This, it may be said, implies that an action would lie if the use of one's right was *unreasonable.*

This, no doubt, is true, under proper limitations, as in cases where there is a right common to both parties, as in the use of a public highway, or of the air; or where there is a duty to perform, and a *correlative* right growing out of it, as the repair of a ruinous house standing so near to the house of another, as to endanger it from its fall. In such a case, no doubt, a repair could be compelled; and, in case of the fall, an action would lie for the special damage. There are also many cases in the books, relating to the relative use of surface streams, where the case has turned upon the question, whether the use was reasonable, and for the party's own convenience or benefit, or wanton and malicious, and done to prejudice the rights of another. In such cases there are *correlative* rights to the use of the water, and the boundary of the right is a *reasonable use* of it. But such cases have no analogy to the case at law, and it may be laid down as a position not to be controverted, that an act legal in itself, violating no right, cannot be made *actionable* on

the ground of the motive which induced it. Such was the case of *South Royalton Bank* v. *Suffolk Bank*, 27 Vt. 505. If the act is lawful, although it may be prejudicial, it is *damnum absque injuria.* On this point the case of *Mahan* v. *Brown*, 13 Wend. 261, is a direct authority. There the defendant had built a high fence *for the sole purpose* of obstructing the lights of his neighbor's house; and it was held, that no action would lie, where the lights were not ancient, and no right had been acquired by grant or user; and that the motive with which the act was done was immaterial. This case goes upon the ground, that the plaintiff was not injured in a legal right.

This is not like the case where the air is contaminated so as to become noxious. There a correlative right is invaded. In the case of *Greenleaf* v. *Francis*, 18 Pick. 117, it is true, the court charged the jury that if the defendant dug the well where he did, upon his own land for the purpose of injuring the plaintiff, and not for the purpose of obtaining the water for his own use, the defendant was liable in that action. In that case, the verdict was for the defendant, and the plaintiff was the excepting party. The plaintiff could not complain of that part of the charge; and, in bank, there was no occasion to review that part of it; and it is no point in the decision, though Judge PUTNAM does remark, in the course of his opinion, that "the rights of the defendant should not be exercised from mere malice as the judge ruled below," but no such point was in judgment. The exceptions came from the plaintiff, and it can only be regarded as an *obiter dictum* of the judge; the case found, that the defendant had dug his well in that place on his land, where it was most convenient for him; and we think, as applied to a case like the one then at bar, and the one now before us, the position was unsound, and against principle and authority.

Judgment of the county court reversed, and the cause remanded.