SEWALL L. HEYWOOD *vs.* DAVIS TILLSON.

Knox. Opinion May 29, 1883.

*Trover. Action. Motive. Employer and employee. Landlord and tenant.*

Trover is not maintainable by the owner of a house against one, though owner of the land, who refuses to employ any tenant who may occupy the same.

An employer has a right to refuse to employ or to retain in his service any person renting certain specified premises, and the owner of such premises has no cause of action against him for the exercise of such right, though such refusal was through malice or ill will to such owner.

ON REPORT.

An action to recover damages for interfering with the plaintiff's tenement house and refusing to employ any laborer who rented the same. Writ dated February 24, 1879. Plea, general issue.

*A. P. Gould*, for the plaintiff.

The facts are much stronger than is necessary to make out a case. It was a wrong done to plaintiff's property, for which he has a remedy.

It was held in *Aldridge* v. *Stuyvesant*, 1 Hall's R. (N. Y.) 210, "that an action on the case lies in favor of a landlord,

against any person who so wrongfully and maliciously disturbs his tenants, that they abandon his premises, and the landlord loses his rent."

In *Carew* v. *Rutherford*, 106 Mass. 1, the court say, "one of the aims of the common law has always been to protect every person against the wrongful acts of every other person, whether committed alone or in combination with others; and it has provided an action for injuries done by disturbing a person in the enjoyment of any right or privilege which he has. Many illustrations of this doctrine are given in Bac. Ab. Action on the Case, F. . . . But as new methods of doing injury to others are invented in modern times, the same principles must be applied to them, in order that peaceable citizens may be protected from being disturbed in the enjoyment of their rights and privileges; and existing forms of remedy must be used."

In *Marsh* v. *Billings*, 7 Cush. 322, the plaintiff by contract with the proprietor of the Revere House had the exclusive right to carry passengers to that hotel from a certain depot, and placed upon his carriage and servants stationed there, "Revere House." The defendant was a hackman, and to get passengers adopted that badge. The court held him responsible in damages in an action on the case.

The defendant claims that he had a right to employ whom he pleased, and to get tenants into his houses if he could; but he forgets the maxim, "*sic utere tuo ut alienum non laedas.*" He had no right to entice away the plaintiff's tenant, even for the honest purpose of filling one of his own tenements, nor had he a right to use his power to dismiss his employees unless they would cut down the rent they had agreed to pay the plaintiff, or quit the tenement, for the purpose of rendering it of no value to the plaintiff.

It is actionable to entice away one's servant, so that his services are lost to the employer, even for the purpose of obtaining those services on the part of the enticer. There are many authorities to this effect. 2 Hill. Torts (2nd ed.), 585, and authorities. An action lies for seducing a journeyman to leave his employer. *Hart* v. *Aldridge*, Cowper, 54. So too, for enticing away a dramatic artist from a theatre where he is

employed. *Lumley* v. *Gye*, 20 Eng. L. & Eq. 168; see *Walker* v. *Cronin*, 107 Mass. 555.

It was not necessary, in order that the plaintiff may recover damages for the loss of his tenant, that the lease should be for a definite period. *Gunter* v. *Astor*, 4 J. B. Moore, 12 (16 E. C. L. 357); *Walker* v. *Cronin, supra; Benton* v. *Pratt*, 2 Wend. 385.

The defendant is liable, not only for the injury sustained by the plaintiff in the loss of the particular tenant who was induced to leave, but he is also liable for the loss of rent occasioned by the conduct of the defendant, which was calculated to deter others from hiring the house. *Greenland* v. *Chaplin*, 5 Exch. 243.

*D. N. Mortland*, for the defendant, cited: *Bowen* v. *Matheson*, 14 Allen, 499; *Com.* v. *Hunt*, 4 Met. 111; *Boston Glass M'f'y* v. *Binney*, 4 Pick. 425; *Greenleaf* v. *Francis*, 18 Pick. 118; *Chase* v. *Silverstone*, 62 Maine, 175; *Frazier* v. *Brown*, 12 Ohio, 294; *Chatfield* v. *Wilson*, 28 Vt. 49; *Wheatley* v. *Baugh*, 25 Penn. 528; *Fernald* v. *Chase*, 37 Maine, 287; *Fifield* v. *M. C. R. R. Co.* 62 Maine, 77; *Bowlin* v. *Nye*, 10 Cush. 416; *Tucker* v. *Tarbell*, 11 Allen, 131.

APPLETON, C. J. This is an action on the case. The plaintiff in his writ alleges that on December 19, 1875 he was seized of a dwelling house on Hurricane Island of great value, yielding an annual rent of one hundred dollars which he should be receiving, were it not for the wrongful act of the defendant, and ought to receive from one Charles H. Sanborn and other tenants; that he leased the dwelling house and premises to said Sanborn for the term of one year, which sum said Sanborn was willing to pay; that the defendant was the occupant and owner of said Hurricane Island, and engaged in quarrying, cutting and working granite, and shipping the same to market; that there was no opportunity to lease any building, except to those in the defendant's employ; yet the defendant knowing this and to deprive the plaintiff of the rents and profits arising therefrom, did on December 29, 1875, order and direct the said Sanborn to pay him only twenty

dollars a year, instead of ninety-six dollars, and threatened to discharge said Sanborn if he did not comply with his order; by means, whereof, the plaintiff received but one dollar and sixty-seven cents per month, instead of eight dollars; that afterwards on August 1, 1876, said Tillson ordered and directed said Sanborn to leave said dwelling house and refused to allow him to remain therein, and threatened to discharge him from his employment, unless he should leave said dwelling house; and that the said Tillson threatened to discharge any and all persons from his employment, and expel them from the island, who should occupy said premises and become tenants of the plaintiff,—by means of which orders, threats and directions, the said Sanborn was induced to and did leave the premises, and refused to pay for the use of the same, and to occupy the same,—whereby the plaintiff has been unable to rent, lease or sell said dwelling house, and has lost all benefit from the same.

The second count is in trover for the conversion of the plaintiff's dwelling house.

The evidence in support of the plaintiff's claim, comes entirely from him, and witnesses called by him.

The defendant is the owner of Hurricane Island, has extensive quarries there, doing a large business, having important contracts with the government, and six hundred men in his employ.

The plaintiff went into the defendant's employ as a stone cutter in 1873, and purchased the house referred to in the declaration, in the fall of 1874, for two hundred and fifty dollars, and was discharged in October, 1875. He testified that he "made no attempt to injure General Tillson, previous to his (my) discharge;" that he "had been taking notes in regard to the management of the job," and was, "going to keep the notes in case the job was ever investigated;" that he "furnished information to the newspapers in regard to the management of the government works;" wrote articles in the Boston Herald and The Rockland Opinion; that when the latter paper was indicted for a libel growing out of the articles, he was here two weeks in procuring witnesses for the publisher; that he said he considered the defendant a damned

scoundrel, that he so testified, on the trial of the indictment, and that he " so considers him now."

The house was built on defendant's land, by verbal permission of his clerk.

Such is the relation of the parties.

The plaintiff claims to recover in trover, but he testifies that General Tillson told him, " that he would not interfere with making a disposition of the property," "that he has never directly assumed to him (me) any control over that house," "that he wanted me to dispose of my property there and go off the island ; he said he should not interfere with my disposing of it," "that any man that rented my house should not work for him." Here is no conversion of the property. The plaintiff might live there. He might sell or lease his estate. He had full control of his property, leaving the defendant at liberty in fixing the terms and conditions on which he would employ those laboring for him. Whatever they might do, here is no conversion of the house of the plaintiff.

The first ground of complaint in the second count in the declaration is, that he " had leased the said dwelling house and premises to the said Charles H. Sanborn for the term of one year from the said day hereinbefore specified (December 29, 1875), for the sum of eight dollars per month, which sum the said Charles H. Sanborn was then and there ready and willing to pay." "Yet the said defendant, well knowing the premises, . . did on the said December 29, A. D. 1875, order and direct the said Charles H. Sanborn to pay the plaintiff only twenty dollars a year, instead of the ninety-six dollars per year, and threatened to discharge said Sanborn from his employment if he did not comply with such order ; by means whereof the said Sanborn was prevented from payment to the plaintiff any more than one dollar and sixty-seven cents, instead of eight dollars per month."

The plaintiff's evidence disproves every material allegation as there set forth, and the above is the most tangible ground of complaint to be found in the whole declaration.

The house was not leased for the year. It was personal property. The plaintiff was not seized of it. Sanborn testifies.

that the plaintiff rented the house to him " for eight dollars a month, so long as he (I) saw fit to occupy it," that he went into the house in October, 1875, and left in August, 1876, and that the amount he " paid Heywood was in the neighborhood of eighty dollars." The plaintiff nowhere alleges that he did not receive the rent as stipulated from Sanborn. The only evidence of ordering out is, what is testified to by Sanborn; that " he said he did not wish to injure me (Sanborn), but the man that lived in Heywood's house could not work for him." But this constitutes no ordering. It was what he had a right to say. It did not interfere with letting to others.

As the house was rented to Sanborn by the month, as " *long as he saw fit to occupy it*," the contract was terminable at the option of Sanborn. He could terminate it when and for what reason he saw fit. The plaintiff could not complain of its termination, no matter how unreasonable it might be. He had no contract with Sanborn that he should remain. He might remain or not. In *Hutchins* v. *Hutchins*, 7 Hill, 104, the defendants, after a will was made, devising certain real estate to A, conspired to induce the testator to revoke it, and effected their object by means of false and fraudulent representations : *Held*, that A, could not maintain an action, as the revocation of the will merely deprived him of an expected gratuity, without interfering with any of his *rights*. So, here, no rights were interfered with. There was no obligation on the tenant to remain. None on the landlord to permit him to remain. All there is, the tenant did not renew his contract. Why he did not is no concern of the landlord. The tenancy was at will. The exercise of that will was the exercise of a perfect right. The motive which induced that exercise, can be no ground of complaint, whether it was the chance of bettering his condition, to gratify a whim of his own or the ill will of another. The landlord cannot complain that a tenant declines to renew his lease. If Sanborn violated any contract, he is liable to the plaintiff in damages.

Besides, an employer has a vital interest in the welfare of his men. He has a right to see that they are not plundered. It was a perfectly proper motive for the defendant to interpose to

prevent an extortionate rent, as that of one hundred dollars a year for a shanty costing but two hundred and fifty dollars. His own interest and his interest in the success of his employees, without the imputation of anything sinister on his part, afford good and sufficient reasons for his intervention.

The question raised is, whether the defendant is liable in damages to a landlord for a tenant's leaving, or for one or many declining to become or not becoming tenants in consequence of his threats that he would employ no one who should become such landlord's tenants, or being his tenants should continue to remain such.

The defendant was doing a large business, having five or six hundred men in his employ. It was of the utmost importance to his success that his employees should be of good habits, friendly to his enterprise and interested in his prosperity. As between the employer and the employee, each may fix the terms and conditions on which the one will employ and the other be employed. "It is well settled," observes SHAW, C. J., in *Com.* v. *Hunt*, 4 Met. 133, "every free man, whether skilled laborer, mechanic, farmer, or domestic servant, may work or not work, work or refuse to work, with any company or individual at his own option, except so far as he is bound by contract." The employer has equal and reciprocal rights to fix the terms and conditions upon which alone he will contract for employment. He is restricted to no color or race. The conditions upon which he insists may be silly or absurd. If acceded to, they are binding on the employee. Whether wise or not, if legal, it is no concern of others. In *Carew* v. *Rutherford*, 106 Mass. 14, CHAPMAN, C. J., uses this language : "Every man has a right to determine what branch of business he will pursue, and to make his contracts with whom he pleases and on what terms he can. . . He may refuse to deal with any men or class of men. And it is no crime for any number of persons, without an unlawful object in view to associate themselves together and agree that they will not work for or deal with certain men or classes of men, or work under a certain price or without certain conditions." The employer has the same right of imposing conditions and limitations as those he may employ.

The workmen may agree that they will not work for an employer, "who should after notice, employ a journeyman, who habitually used it" (liquor), *Com.* v. *Hunt.* A laborer would not be liable to a journeyman who lost employment by reason of such agreement, and the refusal of the employer any longer to hire him. So the master may equally impose as a condition, that his servants shall not board at a house where liquors are kept for sale, and the seller cannot maintain an action against him for the loss of profits on liquors he might have sold his boarders had they remained with him. He may impose as a condition of employment, that certain associates and associations shall be avoided. Good habits are not all that is desirable. An interest in the success of an enterprise is required. The master may impose as a condition of employment, that he shall not associate with one who is inimical to him — who is seeking to injure him — who is acting as a spy upon his proceedings, and who is libelling him in the newspapers.

So, the employer, as he may by contract stipulate with his men where they shall not board, may equally determine where and of whom they may rent the houses they may occupy, and where they may not. The house may be in an unhealthy part of the city, or a disreputable neighborhood. But whatever the reason, good, bad or indifferent, no one has a right to complain.

The owner has no cause of complaint when one says he will not occupy his house, nor when another says he will refrain from doing an act if it be occupied. The defendant was under no obligation — owed no duty to the plaintiff that he should permit his men to occupy his house any more than to a boarding house keeper, that he should permit his men to board with him. The idea of a boarding house keeper suing a man because he declines or refuses to employ his boarders, or the owner of a house, because he will not employ his tenants, is utterly at variance with the right of individuals to make their own contracts. A landlord has no right of action against an employer of men, because he refuses to employ his tenants or boarders. Nor are his rights enlarged because the reason of such refusal is, that they are his tenants or boarders.

Neither is the employer liable if having the tenants or boarders of a landlord in his employ, he discharges them from his service because they choose to remain such tenants or boarders, having the right by his contract with them to terminate their services. If he has not that right he may be liable to those so discharged. If he has, no one else has any right to complain, because an employer having a right to discharge a servant, does discharge him. The contract is between the master and servant, and the master is not obliged to retain his servant in his employ in such case, and no one else can bring a suit against him because he does not.

The defendant has broken no contract. He has made none with the plaintiff. If the plaintiff has none with any one no contract is broken. If there be one, and the tenant has broken it, preferring to continue in the defendant's service, the tenant is liable for such breach. He is the one by whom the contract is broken. He is the principal in its breach. The defendant has done nothing.

It must be remembered that the interference complained of, is not with the general rights of the plaintiff. The threat is not general. It is only as to his employees. The plaintiff may rent to all the rest of humanity. The defendant owes no duty to the plaintiff. He has done him no wrong by declining to employ his tenants, unless he was under some legal obligation to employ them, and was guilty of some wrong in not employing them. This very action is brought upon the assumption that the defendant was in some way under an obligation to employ the plaintiff's tenants; that he was guilty of a dereliction of duty, of a violation of the plaintiff's right, in not employing his tenants, or in threatening not to employ such as should become or were his tenants.

If the defendant had advised a tenant to leave, because the house was in a disorderly neighborhood or too distant from the place of labor, and he had left, it will not be pretended that an action could have been maintained. If he advises and urges him to leave, but fails, however malicious his motive, his malice affords no ground of action. If he procures him to leave with-

out notice he is not responsible. There is no cause of action against him. But if the act, not actionable in itself, is accompanied by a bad motive — affords a ground of action — then it follows, that if an act be in itself lawful, if a bad motive becomes the basis of a suit, that is a man is sued for his motives, irrespective of his conduct.

The defendant had an absolute right to employ or not to employ, a tenant of the plaintiff, and no action would be maintained against him if he chose not to do it.

Threatening not to employ such tenant affords no ground of action on the part of the landlord. A threat to commit an injury is "not an actionable private wrong." Cooley on Torts, 29. It is only the promise of doing something which in the future may be injurious. It may never be carried into effect. It cannot be foreknown that it will be.

The belief on the part of the defendant that the plaintiff had injured and would injure him existing, that from ill will thus arising, he said he would neither employ nor retain in his employ a tenant of the plaintiff, affords no ground of action. Having a right to make that a rule of action, he is not liable for so doing, still less for merely threatening.

The act legal, he cannot be sued for mere ill will or personal animosity, especially when he has cause. "The exercise by one man of a legal right cannot be a legal wrong to another." Cooley on Torts, 685. In *Stevenson* v. *Newnham*, 76 E. C. L. 281, it was held that an act which did not amount to a legal injury could not be actionable because done with a bad intent. The insertion of the word maliciously when the act complained of is not unlawful *per se*, will not make a count good which would be bad without it. *Cotterell* v. *Jones*, 73 E. C. L. 713. Evidence that an act legal in its character was done wantonly and with intent to injure was held inadmissible in *Benjamin* v. *Wheeler*, 8 Gray, 409. In *Randall* v. *Hazelton*, 12 Allen, 415, Colt, J., says "damages can never be recovered where they result from a lawful act of the defendant." The law will not inquire into the motives of the party exercising such right however unfriendly or selfish. "It is generally held that no action will lie against one for acts done

upon his own land in the exercise of his rights of ownership, whatever the motive, if they merely deprive another of advantage or cause a loss to him, without violating any legal right; that is," remarks WELLS, J., in *Walker* v. *Cronin*, 107 Mass. 564, " the motive in such case is immaterial. *Frazier* v. *Brown*, 12 Ohio St. 294; *Chatfield* v. *Wilson*, 28 Vt. 49; *Mahan* v. *Brown*, 13 Wend. 261; *Delhi* v. *Youmans*, 50 Barb. 316." A similar decision was made in *Wheatley* v. *Baugh*, 25 Penn. St. 528. If a wrongful act would suffice, one would think that fraudulent representations by which one was prevented from securing his debt by an attachment would suffice, but it was held otherwise in *Bradley* v. *Fuller*, 118 Mass. 239. "Malicious motives make a bad act worse; but," observes BLACK, J., in *Jenkins* v. *Fowler*, 24 Penn. 308, " they cannot make that wrong, which in its own essence, is lawful, . . . any transaction which would be lawful and proper if the parties are friends, cannot be made the foundation of an action merely because they happened to be enemies. As long as a man keeps himself within the law, by doing no *act* which violates it, we must leave his motives to Him who searches the heart." In *Fowler* v. *Jenkins*, 28 Penn. 176, the preceding case is cited with approval, WOODWARD, J., remarking that, " even a malicious exercise of this right would give the plaintiff no cause of action." In *Glendon* v. *Uhler*, 75 Penn. 467, the same doctrine was reaffirmed. In *Phelps* v. *Nowlen*, 72 N. Y. 45, MILLER, J., says " that the maxim *sic utere tuo ut non alienum laedas*, applies only to cases when the act complained of violates some right, and an act legal in itself, violating no right, cannot be made actionable upon the ground of the motive which induced it." " But motives," say the court in *Pickard* v. *Collins*, 23 Barb. 444, " in doing an act which violates no legal right of another, cannot make that act a ground of action." In *South Royalton Bank* v. *Suffolk Bank*, 27 Vt. 505, it was decided that an act lawful and right in itself, is not actionable on acount of its being performed from an improper or bad motive. "Motive alone," remarks BENNET, J., "is not enough to render the defendants liable for doing those acts which they had a right to do." This doctrine was re-

affirmed in *Chatfield* v. *Wilson*, 28 Vt. 49. There is nothing conflicting with these decisions to be found in *Harwood* v. *Jones*, 32 Vt. 724. In *Hunt* v. *Simonds*, 19 Missouri, 583, it is held that an action does not lie for conspiring to do a lawful act, however malicious the motive, for the very obvious reason that the act was lawful. These views are fully sustained in the text books. Cooley on Torts, 688; *Smith* v. *Bowler*, 2 Disney, (Ohio,) 153; *Kiff* v. *Youmans*, 86 N. Y. 324.

In most of the cases where reference is had to the motive as malicious, it will be found that the act done was wrongful, as in *Bowen* v. *Hall*, 20 Am. Law Reg. 578, where a contract was broken. The breaking the contract was an unlawful act and the inducing it was held to make the person liable — as in the case of enticing a servant from his master, but if there be no contract, one is not liable for inducing a person to leave, though the master wished to further employ him. *Boston Glass Manufactory* v. *Binney*, 4 Pick. 425. In other cases, malice is shown to enhance damages. But if the act be legal, one is not liable for doing it. If doing it from a bad motive, he be made liable, then his liability arises from his motive and not from his act. A different rule would encourage litigation. "Malice," observes MILLER, J., in *Phelps* v. *Nowlen*, might be easily inferred from idle and loose declarations, and a wide door be opened by such evidence, to deprive an owner of what the law regards as well defined rights." This same act under the same circumstances would be a wrong, if done with intent to injure by one man, and if done by another without such intent, would be regarded as fitting and proper. A tort implies a wrongful act done. But mutual ill will between parties antagonistic to each, affords no basis for mutual suits for such ill will. "So in reference to the term damage, the law is," remarks COLT, J., in *Randall* v. *Hazelton*, 12 Allen, 415, "that it must be a loss brought upon the party complaining by a violation of some legal right, or it will be considered as merely *damnum absque injuria*." But a refusal to hire or to continue to retain one in his employ because he boards with one inimical to the employer, does not give a right of action

for such refusal, unless there is some rule of law restricting the employer in the terms and conditions of his employment.

To entitle a plaintiff to recover, there must be a wrong done. "No one is a wrong doer but he who does what the law does not allow."[1] He who does what the law allows, cannot be a wrong doer whatever his motive. "So no one is guilty of a fraud, because he exerts his rights."[2] The motive which may induce such exertion is immaterial.

So far as relates to the case of Sanborn, who was a tenant by the month, the stipulated rent was fully paid, and the tenant left as he had a right to do. He left because defendant would not employ one of the plaintiff's tenants. The defendant had a right to impose that condition. The tenant had a right to his preference.

As to the rest of the world, except the defendant's employees, there was full liberty of sale or rent. As to these, there was liberty, if they chose to risk the chance of employment. The defendant threatened. He might cease to threat. He might never carry his threats in execution. He might never intend to. There is no proof that a single one of his employees was influenced by his threats — wanted to hire plaintiff's house, or would have hired it; or hiring it, would have remained; or remaining, how long any tenant would have remained.

There is no proof of any wrong done — of any legal damage — or of any facts for or on account of which any damages could be assessed — unless threatening to do what a man has a perfect right to do, will constitute a sufficient foundation for an action. If any wrong was done, it was by the tenant in leaving; and if he has broken any contract, or violated any rights of the plaintiff, he alone is responsible for his misfeasance.

*Plaintiff nonsuit.*

[1] Nemo damnum facit nisi quid id fecit quod facere jus non habet.—Dig. xii, 6, 53.
[2] Nullus videtur dolo facere qui suo jure utitur.

BARROWS, J.  I concur in ordering judgment for the defendant here because I think an employer has an absolute right to intervene for the protection of those who are in his service from extortion, and also for the preservation of his own business interests from detriment, by preventing those who are in his employ from associating or dealing with those whom he regards as hostile to himself.

As to what his own interest or that of his employees requires in these respects, his judgment is conclusive, and his legal right to refuse to employ those who will not conform to his wishes and injunctions cannot be questioned.  Except by his own contract he can be under no legal obligation to give employment to any man, and to the making of that contract he may attach any condition not in contravention of law or public policy that he pleases. No one has any legal cause of complaint against him if he exercises the right so to do.

I am of the opinion also that this is in a class of cases where public policy forbids inquiry into the motives of the employer. The spirit of unfriendliness, so often generated by sharp competition in business, and the abundant occasions for difference between employer and employee would be likely to overwhelm with litigation any man or corporation engaged in extensive operations, if every proprietor of a tenement in the vicinity could call him to account before a jury for making it a condition with his workmen that they shall regard his wishes in selecting their place of abode, inasmuch as the same principle would extend to all others who desire to reap a profit by dealing with the workmen.  It is true that in this particular case there was abundant reason, both in the exorbitant rent demanded of the workmen for the tenement, and in the hostile attitude which the owner of it assumed to the employer, to justify the prohibition.  But such proofs might not always be readily attainable.

The point is that those who desire to deal with another's employees have no such vested right in the wages he is to pay them as to authorize them to dictate what terms he shall or shall not make with them, or to complain if he deems it for his interest, or that of his workmen, to make non-intercourse

with themselves a condition of employment. The multiplicity of groundless and malicious suits of this description which would be likely to arise if their maintenance was made to depend on the motive of the prohibition is, of itself, a sufficient reason why no inquiry should be made about it; ·as in the case of public officers acting within the scope of their duty (*Benjamin* v. *Wheeler,* 8 Gray, 409) ; or of those who are merely enforcing a legal claim (*South Royalton Bank* v. *Suffolk Bank,* 27 Vt. 505) ; or of insurers refusing to contract with those whom they distrust ; (*Hunt* v. *Simonds,* 19 Missouri, 583.)

WALTON and SYMONDS, JJ., concurred.

PETERS, J. My judgment is that the law does not permit the plaintiff to recover. The facts alleged by the plaintiff are clearly enough proved. It cannot reasonably be denied, the defendant himself does not deny, that the plaintiff's tenant was induced by the threats of the defendant to quit the plaintiff's tenement. In a moral sense the motive may not have been a justifiable one. Still, the action is not maintainable.

The case comes to this : Can the plaintiff recover against the defendant for inducing, by such means of persuasion and influence as were used by him, a third person, to break a contract or engagement of tenancy with the plaintiff? I cannot see that such a position is warranted by the authorities. It seems to me to be an advance upon the present state of the law upon the subject. The question is not whether a person would be exonerated from liability for causing another to break a contract, if such person has used illegal means to accomplish his purpose. But what is the law of a case where the means used were legal means, or would be so regarded if there was no revengeful motive connected with them.

The defendant had a legal right to employ or not employ a laborer who happened to be a tenant of the plaintiff. By an act or by threat of an act which he had a legal right to perform, he induces the laborer to quit the tenancy. He advises and persuades the laborer to break or not to continue a contract. That is not an offense against the law. If a man can advise, can he not use

any lawful means to make his advice effectual? Morality may notice the motive. In such a case as the present the law cannot.

There are, however, exceptions to these general propositions or rules. At a very early period of the common law an action was given to a person against one who knowingly enticed a servant, minor or apprentice from his master. And that principle has been, by at least a preponderance of authority, gradually and fittingly extended until it now sustains an action whenever the person enticed away is under a contract or duty to perform personal services of any kind to the plaintiff. It is no longer necessary that the employer and the employed should stand in the strict relation of master and servant. The person employed may be a skilled mechanic, an expert even, or a professional performer. Still it must be personal services that are to be rendered. Further than this the cases do not extend the principle.

An exhaustive discussion of the doctrine is contained in the ruling case of *Lumley* v. *Gye*, 2 El. & Bl. 216; 75 E. C. L. and that case is learnedly reviewed in Big. Cas. Torts, 306. The same question lately appeared again in the English Court of Appeal, Exch. Div. in the case of *Bowen* v. *Hall*, and that case is also reviewed, and much learning added to it, in a note by an editor, in 20 Am. L. Reg, N. S. 578. These authorities cover all the ground of discussion, and very little could be profitably added. And in those cases the question was not whether the principle should go beyond instances where the contract was for the rendering of personal services, but whether it should go so far as that under all circumstances. And even upon the question of such limited application of the principle the cases are not fully agreed.

The plaintiff cannot recover unless the principle is to be still further extended. There are strong reasons for making it actionable for one person to persuade wrongfully another to break a contract for personal services. There are also reasons for extending an application of the doctrine, but, I apprehend more to be said against extension. There certainly would be difficulties and dangers in advancing the doctrine beyond its present stage. There may be found among the cases judicial expressions favoring the

right of action as one of general application, but certainly no well considered cases have gone to such an extent. WELLS, J., in *Walker* v. *Cronin,* 107 Mass. 555, 567, says that the doctrine " applies to all contracts of employment, if not to contracts of every description," but that was a case of employment. So in *Lumley* v. *Gye, supra,* some of the arguments of the judges would logically defend the doctrine as applicable to all contracts, but in that case, too, a contract of employment only was involved. The plaintiff cites us to the old common law authorities that it was actionable in a person " to menace of life and member the *tenants* of another," &c. An examination of the note in Big. Cas. Torts, at p. 326, before cited, will, I think, clearly explain, that the rule applied to such tenants as occupied the condition of servants, persons employed by the landowners, tenants who " paid yearly rents and *services.*" Threats of life and member would be most illegal means.

Any man may advise another to break a contract, if it be not a contract for *personal services.* He may use any lawful influences or means to make his advice prevail. In such a case, the law deems it not wise or practicable to enquire into the motive that instigates the advice. His conduct may be morally and not legally wrong. Strictly, in the present case, the defendant has done an act not in itself unlawful by lawful means. The law neither forbids the act nor the means. Standing within the pale of the law, he must have its immunity for the reason stated.

While it may not be denied that the plaintiff's argument has its force, I do not see that the decisions of the courts are a support for it, nor do I bring myself to the belief that the doctrine contended for would be, in view of all cases likely to arise under it, safe and salutary enough to require or excuse its adoption.

VIRGIN, J., concurred.