## DEFAULT IN OPERATION OF A FACTORY LOCATED IN CONSIDERATION OF A BONUS.

Common Pleas Court of Cuyahoga County.

I. N. KINNEY AND ALBERT DIX v. J. F. POCOCK ET AL.

Decided, September 22, 1908.

*Breach of Contract—Action for Recovery of Bonus Paid for Establishment of a Factory—Employes Persuaded by Citizens to Leave Their Employment—Because of Discredit Attaching to Making Beer Bottles—Factory as a Consequence Operated at a Loss—Causes of Action—Joinder—Parties—Representations that Land is Safe from Overflow—Waiver of Time of Payment and of Breach of Payment in Full by Acceptance of Part Payment—Pleading—Making More Definite and Certain—Multiplying Issues—Sections 5005, 5008 and 4995.*

1. Several and independent causes of action growing out of a single breach of a contract may be joined, where the proof of the breach is the same as to each and every cause of action joined.
2. The right to bring suit in the name of one of a class for the benefit of all who have a common or general interest, and are so numerous that it is impracticable to bring them all before the court, is given by statute, and the allegation that plaintiffs brought the action without authority from the others and without their knowledge or consent tenders no issue and is irrelevant.
3. The representation that land was safe from the overflow of a stream is a representation of fact as to the character of the land; but the allegation that at a subsequent time to that when the representation was made the land overflowed from high water of the stream, states no fact alleging such representation to have been false when made.
4. The parties entered into a contract by which the defendants agreed, in consideration of $20,000 bonus, to build a glass factory in Wooster, Ohio, and keep it running ten months a year for ten years, employing not less than 200 operatives, and in case of default, to return the bonus. Plaintiffs knew defendants intended to employ boys because of the cheapness of such labor, and that they were induced to enter into the contract on that account. Defendants defaulted on the contract, and allege in defense of suit for a return of the bonus that plaintiffs joined with others in a crusade against boys working in such a business because of its alliance with the liquor traffic, and thereby prevented them from hiring boys to work in the business, and made it impossible to

carry on the business with profit, and thereby caused the default for which and by reason of which they sued for the return of the money so advanced. *Held:* That the answer alleging such conduct sets forth no defense.

5. The receipt in whole or part of payments at a time subsequent to that agreed upon is a waiver of time of payment and of the breach of the contract by reason thereof.

*Kein & Adair* and *Blandin, Rice & Ginn,* for plaintiffs.
*R. W. McCaughey* and *Kline, Tolles & Goff,* contra.

BABCOCK, J.

I. N. Kinney and Albert Dix sue for themselves and some eleven hundred . others voluntarily associated as the board of trade of Wooster, Ohio. The defendants entered into a contract with the members of this association for locating and building glass works in said city of Wooster, in which some two hundred workmen should find employment, the defendants agreeing to keep the factory running ten months in the year for ten years. The board of trade of said city, assuming to act for and in the name of the citizens of Wooster, agreed to pay the defendants $20,000 for the things so stipulated by them to be done. Among other things in the contract was one providing for a return of the money without interest so paid by the plaintiffs to the defendants in case default was made by them in carrying out the terms of the contract above outlined. The plaintiffs sue for breach of the contract and ask judgment for $18,500, the amount actually advanced to the defendants under the contract. To the petition is attached as an exhibit a copy of the contract. It recites that it is entered into by and between James F. Pocock and the three other defendants (naming them), parties of the first part, and "the citizens of Wooster, parties of the second part, pursuant to a proposition made by said parties of the first part to the citizens of Wooster through its board of trade." The last clause of the contract is as follows: "And we hereby authorize the president and secretary of said board of trade to execute said contract for and in behalf of the board of trade of the city of Wooster as party of the second part." The contract is signed by each of the defendants and by "I. N. Kinney, president *pro tem*" and by "Albert Dix, secretary."

The defendants answer, among other things:

(1). That the plaintiffs have brought this action without authority from the several subscribers of said fund other than themselves.

(2). That they were engaged in the manufacture of glass bottles at Massillon, Ohio, being largely engaged in a bottle factory there; that early in 1902 the defendants were contemplating building another plant where labor might be readily obtained, and the plaintiffs learning of this, offered to contribute liberally toward the construction of a plant at Wooster similar to the defendants' plant in Massillon, Ohio; that plaintiffs invited defendants to Wooster and showed them the premises upon which the factory was afterwards built; that it lay near a stream of water called "Killbuck," and "defendants being solicitous lest the land might be subject to flood and overflow from said stream during high water, made inquiry of plaintiffs and its committee with respect to the fact concerning such danger of flood and overflow, and were thereupon assured by them that there was no such danger, they stating and representing to the defendants that said proposed site was and would be entirely safe from all flood or overflow from said stream. Thereupon, relying upon said representations and the further one that the citizens of Wooster were desirous of having the proposed factory located in that town, the proposed site was selected and the contract was entered into.

(3). The defendants say the factory was thereupon constructed by the defendants upon said site, was completed and full operation begun in January, 1903, but that in January, 1904, said factory was flooded with water from the high water and overflow of said stream. They say that the flood caused great damage to the factory, ruining the machinery and the manufactured product to a great extent, greatly damaging the defendants and making it impossible for them to operate the factory without making expensive repairs and replacements of great cost and necessitating in any event a delay of many months before the factory could again be got ready for operation.

(4). That as soon as the factory could be operated a spirit of hostility against the same was manifested by the citizens of

said city; that it was necessary for the successful operation of the factory for the defendants to employ a large number of boys because of the cost of adult labor in such work, making it impossible to operate the same with such labor at a profit; that the plaintiffs and the board of trade were aware of this fact, and that it would be necessary for the defendants to employ a large number of boys in the operation of the proposed factory at the time defendants were solicited to locate the factory in Wooster; but after having prevailed upon them to locate a factory in the town, they urged the citizens of the town not to permit their boys to enter into defendants' employ in said factory by the use of public statements and by articles published in the public press stating that it was not proper for boys in a factory where beer bottles were manufactured; that these statements and utterances were made generally by members of the board of trade and by a large number of the leading citizens of said city and by many of the persons claimed to be represented by plaintiffs in this suit, and that these statements and utterances stored up and created such a feeling of hostility against the defendants and said factory in the community as deterred parents from permitting their boys from entering the said employment, so that the defendants were unable to procure boys to do the work customarily performed by boys in such factories, and were compelled to employ men to do the work of boys, at more than twice the cost, entailing great loss on defendants and making it impossible to operate the factory at a profit.

The defendants say that in spite of the hostility manifested by the citizens of said city and by the persons whom plaintiffs represented, and in spite of the fact that about $1,500 of the amount agreed to be paid under said contract had not been paid, the defendants in good faith went forward with the contract on their part and proceeded to put the factory in shape for commencing operations for the year 1904, when the factory was flooded with water from the high water and overflow of said stream. They say that by reason of this hostility which was stirred up in the town by the citizens and persons represented by the plaintiffs, it has made it impossible for the defendants to procure necessary labor to operate the factory, and by reason

of the damage done to the factory by the flood, making neces-
sary the expense of repairs and the loss of nearly an entire sea-
son of operation, they suffered a loss amounting to more than the
$20,000 and were unable to go forward with the enterprise, and
to save themselves from still greater loss were compelled to and
did, in September, 1904, sell the factory to the Ohio Bottle Com-
pany.    That said sale was made at a price less than the cost of
the factory and that the defendants sustained loss on account of
entering into the contract existing in the sum of $35,000.    They
say that by reason of the conduct of the citizens of Wooster, and
of the persons who subscribed to the fund to be paid the defend-
ants whom plaintiffs claim to represent, and by reason of the
said misrepresentations with respect to the factory site they were
entitled to terminate the contract on their part and were justi-
fied in so doing.    Wherefore, they pray to be dismissed with their
costs.

On November 14, 1907, Hugh Bowers and eight others by
leave of court became parties defendant and filed their cross-
petition against the defendants, saying that they were parties to
the contract signed by the defendants and contributed to the
fund raised by the citizens of Wooster, as alleged in the petition;
and after setting up their respective subscriptions, they say
"they adopt all the allegations of the plaintiffs' petition and
make the same a part hereof as fully as if rewritten herein and
join in the prayer of the petition and ask that judgment may be
rendered in favor of the said I. N. Kinney and Albert Dix,
plaintiffs."

On the same day, by leave of court, Walter D. Foss, Charles
M. Gray and Albert Dix, trustees for the board of trade of the
city of Wooster, leave having been obtained to become parties
defendant, filed their cross-petition, and, after alleging that
about three hundred of the members of said board of trade, who
were subscribers to the fund, have transferred and assigned all
their rights against the defendants in the cause of action set out
in the petition to them as trustees, make the same allegations as
in the cross-petition of Bowers and others, praying that judg-
ment may be rendered in favor of said plaintiffs against said de-
fendants.

Thereupon the defendants moved to strike from the files the cross-petition of Hugh Bowers and others, and by separate motion they ask that the cross-petition of Walter D. Foss and others, trustees, be stricken from the files for the reason that said persons are not proper parties to this cause and such cross-petitions are not such pleadings as are authorized by law to be filed herein.

The plaintiffs file a motion to strike out of the first defense in the defendant's amended answer certain redundant and irrelevant matter, to-wit, the allegation that the plaintiffs have brought the action without authority from the several subscribers of the fund and without their knowledge or consent, and that the defendants be required to make the second defense more definite and certain by stating the period in the manufacturing season of 1902-3 the factory was operated, and during what months and for what part of the season 1904-5 the factory was operated by the Ohio Bottle Company.

They also ask that the third defense be made more definite and certain (*a*) by stating the name or names of those who assured the defendants that there was no danger of flood and overflow from said stream, and that the site was and would be entirely safe from flood and overflow; (*b*) by stating the name or names of those who represented to defendants that the citizens of Wooster were desirous of having the proposed factory located in that town; (*c*) by stating the names of those who manifested a spirit of hostility against the operation of said factory, and how the same was manifested; (*d*) by stating the name or names of those who by public statements and by articles published in the public press and by circulars urged the citizens of the town not to permit their boys to enter into the defendants' employ; (*e*) by stating what statements were made, and what articles published, by each of said persons; (*f*) by stating more fully and explicitly the injury done to the machinery and the manufactured produce by reason of flood, and the expense for repairs occasioned thereby.

Plaintiffs demur to the defendants' third defense on the ground that the same does not constitute a defense to the plaintiffs' cause of action.

The right of the cross-petitioning defendants to intervene will be first considered. It has already been held on demurrer that the action is maintainable by the plaintiffs in its present form under Section 5005, Revised Statutes, giving the right to "all persons having an interest in the subject of the action and in obtaining the relief demanded" to join as plaintiffs, supplemented by Section 5008, Revised Statutes, which provides "when the question is one of a common or general interest of many persons, or when the parties are very numerous and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all"; or, if not under these provisions, then under Section 4995, Revised Statutes, authorizing an action by the trustee of an express trust, or one "with whom or in whose name a contract is made for the benefit of another."

The court is of opinion that all subscribers to the fund might have joined under the first named section and that by reason of numbers the action was properly brought by two of them for the benefit of all. *Upington* v. *Oviatt*, 24 O. S., 232; *Platt* v. *Colvin*, 50 O. S., 703, and *Farmers M. F. & L. Ins. Co.* v. *Ward et al*, 5 C. C.—N. S., 509 (24 O. C. C., 156), are believed to sustain this position. When such a case is brought the parties represented, but not appearing of record, are as much interested in and bound by the determination of the suit as they would be if named and brought upon the record. May they not, then, take part in the trial and be heard in the production of witnesses and the advocacy of their rights? To deny them this would seem to be a denial of justice, and how may they avail themselves of these rights except by having their names entered on the record and their relation to the issue brought to the attention of the court?

These cross-petitions are criticized as multiplying and confusing the issues and involving defendants in the necessity of filing a thousand or more answers, if each subscriber to the fund is permitted to intervene and he sees fit to avail himself of the privilege. This, if true, is no valid objection, unless some right of the defendants is violated. One who contracts with a thousand may involve himself with them in complicated situations; but if so, the embarrassment results from the complicated con-

tractual relations he has voluntarily assumed. This embarrassment can be overcome, but the denial of a right to intervene in a suit which is binding upon a party is insurmountable. But, in fact, the embarrassment complained of in this case does not exist. No new issue is tendered by any of the cross-petitioners, and no answer to their pleadings is required. They simply join in the prayer of the petition, and thereby align themselves on the side of the plaintiffs in the controversy. It therefore follows that the motions to strike off ·the intervening cross-petitions should be overruled.

The plaintiffs move to strike out of the first defense the allegation that ''plaintiffs have brought the action without authority from the several subscribers of the fund and without their knowledge or consent.'' If authorization or consent is necessary to the maintenance of this action by the plaintiffs, then this allegation is relevant; otherwise not. The authority is given by the statute or it does not exist, for parties can not invest others with the right to sue for them except by clothing them with an interest or a trust, and in that case the right to sue grows out of the rights so vested and not by direction or consent subsequently given. If these defendants have any defense in bar or otherwise to the claims of any or all of the subscribers to the fund, they may plead the same; but the allegation that the plaintiffs were not given authority to bring suit raises no issue. Motion to strike out is sustained.

Plaintiffs move for an order requiring defendants to make more definite and certain the allegations of the second defense by stating the period in the manufacturing season of 1902-3 that the factory was operated, and during what months and for what part of the season of 1904 the factory was operated by the Ohio Bottling Company. The defendants concede the propriety of this motion. It will, therefore, be granted.

The plaintiffs move with six specifications as to the third defense, and at the same time demur to it on the ground that it does not constitute a defense to the plaintiffs' cause of action. If the demurrer is well taken, the motion needs no consideration. It will therefore be considered first. This defense sets forth the claim that the plaintiffs represented ''that said proposed site was and would be entirely safe from all flood and overflow

from said stream.'' This seems to be more than the expression of an opinion, and to amount to the statement of a fact. The fact stated is that this land does not overflow from the high water of Killbuck creek.

''Where a person, by means of false representations of facts materially affecting the identity and value of certain real estate, induces another to enter into a contract for the purchase thereof, upon the faith of such representations and upon which he was justified in relying, the purchaser may, in an action brought by the vendor for the purchase price, recoup the damages which he has sustained by reason of such false representations, although the vendor believed them to be true when made and had good reason for so believing.'' *Mulvey* v. *King*, 39 O. S., 491.

This rule is fixed between vendor and vendee, but we see no reason why it may not be extended to parties in the present relation. The rule thus stated is most favorable for the protection of those induced to enter into contracts through representations which are false. On authority of this case, fraudulent intent in making the misrepresentation as to ''facts materially affecting the identity and value'' of the property need not be alleged, but it is necessary to allege that the representation was false. This is not done unless the statement that the factory was flooded from the high water of said stream a year afterwards amounts to such allegation. If the stream had never overflowed this factory site up to the time that the representation was made, then it was true when made, and the subsequent overflow would not make it false. Therefore, to state that it overflowed a year later does not challenge the truth of the representation alleged to have been made. The allegations taken together state a misfortune rather than a misrepresentation. They fail to charge either false representation or false warranty.

These defendants also allege that it was necessary for the successful operation of the factory for the defendants to employ a large number of boys because of the cost of adult labor in such work, making it impossible to operate the same with such labor at a profit; that the plaintiffs and the board of trade were aware of this fact, and that it would be necessary for the defendants to employ a large number of boys in the operation of the proposed factory at the time defendants were solicited to

locate the factory in Wooster, but after having prevailed upon them to locate a factory in the town, they urged the citizens of the town not to permit their boys to enter into defendants' employ in said factory, by the use of public statements and by articles published in the public press, stating that it was not proper for boys to work in a factory where beer bottles were manufactured; that these statements and utterances were made generally by members of the board of trade and by a large number of the leading citizens of said city and by many persons claimed to be represented by plaintiffs in this suit, and that these statements and utterances stirred up and created such a feeling of hostility against the defendants and said factory in the community as deterred parents from permitting their boys from entering the said employment, so that the defendants were unable to procure boys to do the work customarily performed by boys in such factory, and were compelled to employ men to do the work of boys at more than twice the cost, entailing great loss on defendants and making it impossible to operate the factory at a profit. They further say that by reason of this hostility stirred up by the citizens of the town and persons represented by plaintiff, together with the damage done to the factory by the flood, they suffered a loss amounting to more than $20,000; that they were unable to go forward with the enterprise, and, to save themselves from still greater loss, were compelled to and did, in September, 1904, sell the factory to the Ohio Bottling Company; and they allege a loss by reason of the premises of more than $35,000.

The principle of law invoked by defendants is aptly stated in *Taylor* v. *Risley,* 28 Hun. (N. Y.), 141:

"The law will not permit a party who has become entitled to the performance of an agreement by another to intervene so as to prevent such performance being made, and then, on the basis of such failure, to claim damages against the party because of his omission to perform his agreement."

The above rule unquestionably states the law and in apt terms, but the difficulty presented here is in its application to the case at bar. Are the plaintiffs here charged with interfering with defendants' performance of the contract? Certainly, third par-

ties might urge the impropriety of boys or adults engaging in the manufacture of beer bottles or any other article of manufacture, if they saw fit. The doctrine applied to labor conspiracies is not applicable to this controversy since conspiracy is not charged. The cases applicable thereto will not, therefore, be considered. The interference, if it is alleged to exist at all, is by reason of a contract relation having been assumed and violated, to the defendants' damage. The case last above named involved the charge of interfering with the defendants' performance of his contract to deliver a certain quantity of yellow pine timber to plaintiff at Brooklyn, New York, on or before a fixed time. The defendant alleged in his answer his inability to get the timber at the usual southern ports because of the yellow fever epidemic, but that he entered into negotiations with one Bacon of Savannah, Ga., for the purchase of the requisite lumber, and would have succeeded in purchasing and delivering it but for the interference of plaintiff, who, learning that defendant was negotiating with Bacon for the lumber, for the purpose of preventing defendant from purchasing it, induced Bacon to decline and refuse to sell it to defendant, whereby he was unable to deliver any portion of the lumber to plaintiff as he had agreed to do. Taylor's interference was by negotiating the purchase of the lumber himself with knowledge that Risley was negotiating for it, and the answer charged him with doing it so as to prevent the defendant from purchasing and performing his contract.

"*Held:* That the facts stated in the answer would, if proved, have defeated the action, and that the court erred in refusing to allow the defense to prove them."

Taylor's interference was not alone in negotiating for the lumber, but with doing it for the purpose of preventing the defendant from performing his contract; it was in fact the act of the plaintiff which caused the breach, and not that of the defendant.

Barker, J., dissenting, says:

"The defendant seeks to be relieved from a performance of his contract, because the plaintiff interfered with its execution as set forth in his third answer. It is not pretended that the

plaintiff has done, or omitted to do, any act which is in violation of any of the terms of the contract, either express or implied.

"In support of his argument on this question he relies on the general precept of the law, which is applicable to all cases whatever, that a promisor will be discharged from all liability when the non-performance of his obligation is caused by the act or fault of the other contracting party.

"This proposition would be available to the defendant as a defense to a recovery, if the plaintiff has done any act of an unlawful or wrongful character which is actionable in and of itself, having the direct and natural effect of preventing or interfering with the performance of the contract on the part of the defendant, such as destroying lumber belonging to the defendant suitable to be delivered under the contract, and intended so to be, or destroying the mills at which the timber was to be manufactured, or the vessels in which it was designed to transport the same. Such acts and interferences on the part of the plaintiff would prevent him from maintaining an action based upon the defendant's non-performance.

"But mere misbehavior on the part of the plaintiff, and censurable conduct, not wrongful and actionable in the eyes of the law, and which among fair-minded men is regarded as an interferance in the business of others, exhibiting ill-feeling and indicating an unfriendly spirit, can not be inquired into, and made an excuse for the non-performance of the engagements of the contracting party so disturbed and annoyed. Such we regard to be the nature and character of the plaintiff's acts of interference as set forth in the answer, and which the defendant offered to prove. For aught that was averred, the things said and done were truthful and proper things for the plaintiff to say and do under the circumstances.

"It is averred that the plaintiff did interfere with the making and concluding of a bargain between the defendant and Bacon, the lumber merchant of Savannah, with the intention on his part of preventing the defendant's being able to execute his contract and deliver the lumber as agreed. This would not constitute a defense, unless the act of interference was such as could be denominated wrongful and actionable in law. For the plaintiff could, without furnishing an excuse to the defendant for non-performing his contract, have entered the market in Savannah and negotiated with lumber merchants for the same material that the plaintiff contemplated purchasing, and conclude a bargain in his own behalf, although his intentions were to annoy and prevent the defendant from executing the contract, yet it would not relieve him from that obligation."

The court based the decision of this case on the right of one contracting party to be free in performing the contract from the malicious or wanton interference or annoyance of the other party. The dissenting opinion makes the wrongfulness of the act the test of interference.

"An act legal in itself and which violates no right can not be made actionable on account of the motive which induced it." *Chatfield* v. *Wilson*, 28 Vt., 49.

"An act which does not of itself amount to a legal wrong can not be made so by a bad motive." *Chambers* v. *Baldwin*, 11 L. R. A., 545.

In *Frazier* v. *Brown*, 12 O. S., 294, the cause of action stated was diversion, with malicious intent, by the defendant of subterraneous water on his own land from adjoining land of the plaintiff; but it was held there could be no recovery, because, as said by the court, "the act done, to-wit, the using of one's own property, being lawful in itself, the motive with which it is done—whatever it may be as a matter of conscience—is in law a matter of indifference."

Boynton, J., in *Railroad Co.* v. *Bingham*, 29 O. S., 369, says:

"Where no right has been invaded, although one may have injured another, no liability has been incurred. Any other rule would be manifestly wrong."

In *Letts* v. *Kessler*, 54 O. S., 73, the question was as to liability for maintaining a spite fence for motive of unmixed malice. Says Burkett, J., on page 81:

"In effect he has a right to shut off the light and air from her windows by building on his own premises, and she is not in effect concerned in the means by which such effect is produced, whether by a building or other structure; nor is she concerned as to the motive, nor as to whether he makes or loses by the operation. In the one case she might have a strong suspicion of his malice, while in the other such suspicion would be ripened into a certainty: But this is nothing to her as affecting a property right. As long as he keeps on his own property, and causes an effect on her property which he has a right to cause, she has no legal right to complain as to the manner in which the effect is produced, and to permit her to do so, would not be enforcing a right of property, but a rule of morals."

The principle underlying these cases seems to be that an act not violative of any contract provision can not be a wrongful interference with the performance of the contract unless it is unlawful in the sense of being in excess of one's legal rights. In other words, an act not wrongful in and of itself and not in violation of the terms of the contract express or implied, furnishes no excuse for its non-performance even though such act may embarrass performance by the other party. As to what constitutes an unlawful act in this relation the authorities are not in accord. Some hold that an act otherwise innocent becomes wrongful when done with a purpose to cause the other party to default in performing the contract, if damage results. Others deny that the motive can give character to the act. As said in *Jenkins* v. *Fowler,* 24 Pa. St., 308:

"Malicious motives make a bad case worse, but they can not make that wrong which in its own essence is lawful."

The court inclines to the latter view, but it is not necessary to decide this point, since the answer does not allege any act done by the plaintiffs from evil motive or purpose to bring the defendants into default in performing the contract.

Did the acts complained of violate any of the terms of the contract? They did not, unless a promise not to interfere with the labor market for boys' labor in Wooster, to defendants' injury, is implied.

In *Peck* v. *United States,* 102 U. S., 64, the claimant entered into a contract with the proper military officer to furnish and deliver a certain quantity of wood and hay to the military station at Tongue river in the Yellowstone region, on or before a specified date. He furnished the wood, but failed to furnish the hay, which was furnished by other parties at an increased expense. The accounting officer claimed the right to deduct from the claimant's wood account the increased cost of the hay. The court, upon an examination of the contract and attending circumstances, were of opinion that the parties contemplated the hay to be cut at the Big Meadows in the Yellowstone valley, near the mouth of Tongue river, which was, indeed, the only hay plaintiffs could have procured within hundreds of miles, and which it was known he relied on. The government officers, feeling that

the claimant would not be able to carry out his contract, had allowed other parties to cut this hay, whereby Peck was unable to perform his contract and failed to deliver the hay.   Justice Bradley, on page 65, says:

"We think the facts of the case clearly bring it within the rule allowing the introduction of parol evidence, first, for the purpose of showing by the surrounding circumstances the subject-matter of the contract, namely, hay to be cut and gathered in the region where it was to be delivered; secondly, for the purpose of showing the conduct of the agents of the defendants by which the claimant was encouraged and led on to rely on a particular means of fulfilling his contract until it was too late to perform it in any other way, and then was prevented by these agents themselves from employing those means.   The supply of hay which he depended on and which, under the circumstances, he had a right to depend on, was taken away by the defendants themselves.   In other words, the defendants prevented and hindered the claimant from performing his part of the contract."

This case is authority for the proposition that parol evidence is admissible to show that the parties contracted with reference to performance from certain sources of material or the employment of certain means to that end called the subject-matter of the contract, and that interference with such means, if it prevents performance, is a breach of an implied term of the contract, and any damage resulting from the non-performance flows from the act of interference and not from the failure of the one thus interfered with.   This doctrine is of frequent application and needs no citation of authorities to support it.   The scope of its application is not defined in any of the cases brought to the attention of the court.   But no case is cited and research has failed to disclose any case where interference with the subject-matter of the contract has been extended to a situation like the one at bar.   If these plaintiffs bound themselves not to interfere with the labor market of Wooster, it is difficult to see why they might not also have contracted away the right to interfere with the market in Wooster for the sale and distribution of the product the defendants contemplated making, had such market been the inducement to the location of the factory there, and so have fostered a monopoly with legal sanction.   Would it have been an interference with defendants' rights had the

board of trade encouraged the location of other factories employing boys' labor, and resulting therefrom in embarrassing these defendants in finding sufficient cheap labor in Wooster? This membership of the board represents a considerable part of the population of this small city. Had they contracted away the right to direct their own sons into other channels of employment? Did they, in entering into this contract, intend to abridge their right to promote by word and act policies believed to advance the public welfare or morals? Would their encouragement of legal prohibition of the liquor traffic be a violation of this contract, if it resulted in the destruction of the market for beer bottles? These and other considerations forbid our applying any different rule to the conduct of the plaintiffs in determining the question as to their liability than the one which would be applied to strangers to the contract; and since conspiracy to injure the plaintiffs in their rights of property is not charged, the allegations of fact under consideration do not bring this defense within any recognized legal principle.

There remains for consideration the allegation making the second defense a part of this one by reference. May a defense be repeated by reference to it and making it a part of another defense, and thereby place such other defense, which is defective, beyond the reach of demurrer? Of this there is doubt, but the matter which is made a part of this defense by reference amounts only to the charge that plaintiffs did not pay their subscription when due and payable, and consequently are barred of the right to recover upon the contract. The allegations of the petition which are not denied are to be treated as confessed. Among these is one stating that defendants waived strict performance of the contract by receiving payments after all of them were due and payable until all of the subscriptions were paid excepting the sum of $1,500. It is an elementary principle that time of performance, including the time of making payments, is waived by accepting payments after they are due and payable, and when waived, the failure to pay is not available to defeat an action on that account. See Page on Contracts, Section 1502, on waiver of provisions as to time of performance.

For the reasons stated, the demurrer is sustained. The motion with its six specifications need not be considered.